F I L E D
**United States Court of Appeals
Tenth Circuit**

**February 17, 2006**

**Elisabeth A. Shumaker
Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

PABLO GARCIA,

    Defendant-Appellant.

No. 04-8123

(D.C. No. 04-CR-33-D)

(D. Wyo.)

**ORDER AND JUDGMENT**[*]

Before **HENRY**, **BALDOCK**, and **MURPHY**, Circuit Judges.

A jury convicted Defendant Pablo Garcia of possession with intent to distribute over five kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). Defendant was sentenced to 121 months imprisonment and five years supervised release. On appeal Defendant argues the district court erred in denying his motion to suppress or, in the alternative, his motion for judgment of acquittal. We have jurisdiction under 28 U.S.C. § 1291, and affirm.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

I.

The facts leading to Defendant's arrest, as found by the district court on the motion to suppress and as heard by the jury at trial, are as follows: Wyoming Highway Patrol Trooper Ben Peech stopped an SUV in which Defendant was a passenger on Interstate 80 eastbound after observing the SUV following a wrecker too closely. Trooper Peech identified seventeen-year-old Ramon Murillo as the driver of the SUV. Other occupants of the SUV included Murillo's girlfriend and their son, as well as his "buddy" Jessie. Trooper Peech explained the reasons for the stop and asked Murillo for his driver's license, registration, and proof of insurance. Murillo produced an "interim driver's license" and a high school picture ID card. Defendant, who was seated in the front passenger seat, handed Trooper Peech the rental agreement for the SUV. Unsure of whether he would issue Murillo a warning or a ticket, he asked Murillo to accompany him back to the patrol car where Trooper Peech intended to counsel him about the dangers of following too closely.

Trooper Peech observed Murillo seemed very nervous. His hands were shaking when he handed Trooper Peech his paperwork, his breathing was rapid, and he seemed to be perspiring from his forehead and face. Initially, Trooper Peech thought Murillo may be nervous because he was a relatively young driver encountering law enforcement for the first time. Trooper Peech discussed the dangers of following too closely and told Murillo he was going to issue him a warning. Murillo's nervousness continued even after being told he was going to get a warning. While Trooper Peech filled out the warning ticket, he asked Murillo

about his travel plans. Murillo stated he and the passengers were traveling to Chicago to visit his aunt and would be staying in Chicago until after the New Year's. Trooper Peech noticed, however, the rental agreement indicated the SUV was due back in California by December 27th.

Trooper Peech asked Murillo who had rented the SUV. Murillo responded his grandfather, the Defendant. Trooper Peech reviewed the rental agreement and noticed Defendant was the only authorized driver on the rental agreement. Trooper Peech gave Murillo the warning and his paperwork and asked him to wait in the patrol car while he spoke to Defendant about the risk of allowing an unauthorized person to drive the rented SUV.[1] Trooper Peech approached Defendant and told him that per the rental agreement, Murillo was not authorized to drive the rented SUV and Defendant would have to drive. Trooper Peech asked for Defendant's identification to verify Defendant had rented the SUV. While Trooper Peech verified this information, he asked Defendant if he would answer some questions about his travel plans. Defendant consented. Defendant stated they were going to Chicago to visit an aunt. Defendant stated, however, they would be there approximately two to three days because the SUV was due back in California by December 27th. Defendant indicated he understood he should not let unauthorized persons drive the SUV. As Trooper Peech walked back to the patrol car, Defendant moved to the driver's side of the SUV.

---

[1] Trooper Peech testified that in his experience if a rental company is notified that the rented vehicle has been stopped while an unauthorized person was driving the vehicle, the rental company will usually ask law enforcement to retrieve the car from the renter.

3

Trooper Peech allowed Murillo to exit the patrol car and told him to "have a safe trip." As Murillo walked back to the SUV, Trooper Peech asked him if he would answer a few more questions. Murillo agreed. Trooper Peech asked Murillo again about his travel plans and the occupants of the SUV. Murillo again stated they were going to be in Chicago until after New Year's and that Jessie was his friend and had been living with him for a while because his parents had gone to a lake for Christmas. Trooper Peech approached Jessie and asked him if he would answer some questions, to which Jessie agreed. Trooper Peech asked Jessie the same questions he asked Murillo in an effort to compare stories. Jessie stated they were going to Chicago and would return before New Year's. Jessie further stated he did not live with Murillo but instead lived in the garage above his grandmother's house.

Inconsistencies in the two stories, Murillo's nervousness, and the quick turnaround trip heightened Trooper Peech's suspicions. Trooper Peech asked Defendant if they had any drugs, guns, large amounts of cash, or any contraband in the SUV. All the occupants indicated no. Trooper Peech asked Defendant, both in Spanish and English, if he could search the car, to which Defendant and the other occupants agreed. Defendant opened the rear window and tailgate for Trooper Peech. Trooper Peech immediately noticed all the rear seat bolts had been recently altered. Blue flakes of paint on the carpeting covered the floor of the car. The bolts on the rear seats had recent tool-markings, and the paint on the bolts was disturbed. The front seat bolts did not appear to have been altered.

4

Trooper Peech walked back to his car and radioed for a drug canine. Once on the scene, the drug canine was deployed around the car and alerted to the back seat of the SUV on the driver's side. Trooper Peech began inspecting the rear driver's side seat. Trooper Peech pulled back the seat cover on the back rest portion of the seat and noticed the foam that would normally be in the seat had been cut away. Trooper Peech could see five "bricks" inside the seat. Using his pocket knife, he stuck one of the "bricks" and noticed it contained a white powder. Based on his experience, he believed the "bricks" contained cocaine. The white powder subsequently tested positive for cocaine.

II.

On appeal Defendant challenges the district court's denial of his motion to suppress as well as its denial of his motion for judgment of acquittal. See Fed. R. Crim. P. 29. As to the former, Defendant has argued throughout that Trooper Peech unlawfully detained him after the purpose of the stop was completed. Specifically, Defendant argues Trooper Peech completed the purpose of the stop when he gave Murillo the warning and returned his paperwork. According to Defendant, all subsequent questioning and detention exceeded the purpose of the stop and violated Defendant's Fourth Amendment rights. As to the latter, Defendant argues the Government did not present any evidence suggesting Defendant knew the cocaine was in the SUV or that he intended to distribute the cocaine. Thus, according to Defendant, no reasonable jury could have so found. We reject each contention in turn.

A.

In reviewing the denial of a motion to suppress, we consider the totality of the circumstances and view the evidence in a light most favorable to the Government. We accept the district court's factual findings unless clearly erroneous. See United States v. Rosborough, 366 F.3d 1145, 1148 (10th Cir. 2004). The ultimate determination of reasonableness under the Fourth Amendment is a question of law reviewable de novo. Id.

An investigative detention may only last as long as necessary to effectuate the purpose of the stop. See United States v. Manjarrez, 348 F.3d 881, 885 (10th Cir. 2003). The scope of the detention must be carefully tailored to its underlying justification. Id. Generally, an officer must allow the driver to leave once the initial justification for the traffic stop has concluded. Id. During a routine traffic stop, an officer may ask questions, examine documentation, and run computer verifications as necessary to determine whether the driver has a valid license and is *entitled to operate the vehicle*. United States v. Wood, 106 F.3d 942, 945 (10th Cir. 1997) (emphasis added). The officer may detain the driver and the vehicle as long as reasonably necessary to make these determinations. Id.

Defendant argues Trooper Peech completed the purpose of the traffic when he gave Murillo the warning and returned his paperwork. We disagree. After asking Murillo who had rented the SUV and reviewing the rental agreement, Trooper Peech had a legitimate reason, before allowing Murillo to go free, to approach Defendant to confirm Defendant was, in fact, the person who rented the SUV and was authorized to drive it. Thus, Trooper

6

Peech's conduct fell within the permissible scope of the traffic stop. See United States v. Santana-Garcia, 264 F.3d 1188, 1193 (10th Cir. 2001) (noting an officer is authorized to inquire as to the vehicle's ownership or authority to operate the vehicle). The purpose of the initial stop was completed only after Trooper Peech was able to verify this information. See, e.g., United States v. Galindo-Gonzales, 142 F.3d 1217, 1223 (10th Cir. 1998) (noting a defendant's lack of indicia of proof to lawfully operate and possess a vehicle gives rise to objectively reasonable suspicion that the vehicle may be stolen). Accordingly, Defendant's detention while Trooper Peech verified Defendant's authority to operate the vehicle was not extended beyond its original scope.

Defendant also argues the search of the vehicle exceeded the scope of his consent because (1) he did not consent to a narcotic's dog search, and (2) he did not consent to the dog entering the SUV's interior. Defendant's arguments are meritless. "[C]onsent is not required for a dog sniff of a lawfully detained vehicle." United States v. Chavira, 9 F.3d 888, 890 n. 1 (10th Cir. 1993). As the Supreme Court recently explained, a canine sniff on the exterior of a vehicle during a lawful traffic stop does not implicate legitimate privacy interests because it "does not expose noncontraband items that otherwise would remain hidden from public view." Illinois v. Caballes, __ U.S. __, 125 S. Ct. 834, 838 (2005). Based upon Murillo's nervousness; the inconsistent stories between Murillo, Jessie, and Defendant; and the quick turnaround trip; Trooper Peech had articulable and reasonable suspicion necessary to continue detaining Defendant in order to determine whether the

vehicle might contain contraband.  The canine sniff occurred while Trooper Peech was conducting this lawful detention, and, as a result, Defendant's consent was not required.  After deploying the canine around the SUV, the canine alerted the Troopers to the back seat on the driver's side of the SUV.  At this point, the Troopers had probable cause to search the interior of the SUV for contraband, and the search was no longer premised on Defendant's consent.  See United States v. Ludwig, 10 F.3d 1523, 1528 (10th Cir. 1993) (concluding a canine alert outside the trunk of a vehicle creates probable cause to search the inside of the trunk for drugs).  Accordingly, the district court properly denied Defendant's motion to suppress.

## B.

Defendant next argues the Government did not adduce sufficient evidence at trial to prove beyond a reasonable doubt Defendant was guilty of possession with intent to distribute a controlled substance.  We review the record *de novo* to determine whether viewing the evidence–both direct and circumstantial, together with the reasonable inferences to be drawn therefrom–in the light most favorable to the Government, any rational trier of fact could have found Defendant guilty of the crime beyond a reasonable doubt.  See United States v. Avery, 295 F.3d 1158, 1177 (10th Cir. 2002).  In conducting this inquiry, we do not weigh conflicting evidence nor consider the credibility of witnesses.  United States v. Delgado-Uribe, 363 F.3d 1077, 1081 (10th Cir. 2004) (citation omitted).  Instead, we must only determine whether the evidence adduced at trial, if believed, would establish each element

of the crime.  Id.

The elements of the crime of possession with intent to distribute are well-established. See United States v. McKissick, 204 F.3d 1282, 1291 (10th Cir. 2000).  To sustain a conviction for possession with intent to distribute under 21 U.S.C. § 841(a)(1), the Government must prove beyond a reasonable doubt: (1) the Defendant possessed the controlled substance; (2) the Defendant knew he possessed the controlled substance; and (3) the Defendant intended to distribute the controlled substance.  Id.  Possession of a controlled substance can be either actual or constructive.  Id.  Constructive possession exists where "a person knowingly has ownership, dominion, or control over the narcotics and the premises where the narcotics are found."  United States v. Reece, 86 F.3d 994, 996 (10th Cir. 1996) (citation omitted).  We have alternatively defined constructive possession of a controlled substance as "an appreciable ability to guide the destiny of the drug."  United States v. Carter, 130 F.3d 1432, 1441 (10th Cir. 1997).

Because Defendant was not the only passenger in the SUV, this case involves joint occupancy and nonexclusive possession.  "In cases involving joint occupancy of a place where contraband is found, mere control or dominion over the place in which the contraband is found is not enough to establish constructive possession."  McKissick, 204 F.3d at 1291, see also Reece, 86 F.3d at 996 (holding evidence insufficient to support a conviction for possession where the government only showed defendant drove the car in which the narcotics were found and was acquainted with the individual on whose person the narcotics were

9

found). The Government must, therefore, present "direct or circumstantial evidence to show some connection or nexus individually linking the defendant to the contraband." McKissick, 204 F.3d at 1291 (quoting United States v. Valadez-Gallegos, 162 F.3d 1256, 1262 (10th Cir. 1998). In other words, the Government must adduce evidence supporting a plausible inference that the defendant had knowledge of and access to the contraband. Id. After carefully reviewing the trial record under the applicable standard, we conclude the Government presented sufficient evidence from which a reasonable jury could find Defendant possessed with intent to distribute the cocaine found in the SUV. The evidence was sufficient to support an inference Defendant had knowledge of and access to the cocaine in the SUV. First, the evidence at trial showed Defendant had within the last four months taken at least four short trips in which he rented a car for a week, usually a mini-van, paying approximately $500-$600 per trip for the rental cars. The evidence further showed Defendant's monthly income was approximately $800 per month. Second, the evidence showed that at least on two prior trips, Defendant drove to a particular destination intending to pick up another vehicle and drive it back to California. On one occasion Murillo drove one of these vehicles back to Mexico. In Trooper Peech's experience, many times the large amounts of cash received from a drug transaction are transported in a different car than that in which the drugs were transported so that none of the smell from the drugs lingers in the car, thus reducing the possibility that drug canine will alert to the car if stopped. Third, Trooper Peech testified the market value of the cocaine was between $500,000 and $2

10

million dollars, and drug organizations do not trust people with that much contraband unless they have been involved with them for some time and have shown to be trustworthy.

The reasonable inferences drawn from the evidence the Government adduced at trial support a conclusion Defendant knew the cocaine was in the SUV, had access to the cocaine, and had the specific intent to distribute it once in Chicago. See United States v. Taylor, 113 F.3d 1136, 1144 (10th Cir. 1997) (noting that in joint occupancy constructive possession cases, the government must present some evidence supporting at least a plausible inference that the defendant had knowledge of and access to the contraband). Viewed under the totality of the circumstances, the evidence provides the necessary nexus between the cocaine and Defendant to support his conviction. Id.

Defendant makes a last attempt to persuade us by arguing we should take into account Murillo's testimony at trial when considering whether the Government met its burden of production. Murillo testified that unbeknownst to Defendant, Murillo received the cocaine from an individual seeking to hide it, and he placed the cocaine in the SUV so that he could get rid of it somewhere on the way to Chicago. Since the jury determines the credibility of witnesses, the jury was at liberty to disbelieve any or all of his testimony. On appeal we may not resolve conflicting evidence or weigh the credibility of witnesses. See United States v. Pappert, 112 F.3d 1073, 1077 (10th Cir. 1997).

For the foregoing reasons, the judgment of the district court is–

AFFIRMED.

Entered for the Court,


Bobby R. Baldock
Circuit Judge