No. 97,447

STATE OF KANSAS, *Appellee*, v. RONNIE MORLOCK, *Appellant*.

(218 P.3d 801)

Opinion filed November 6, 2009.

*Mark T. Schoenhofer*, of Law Office of Mark T. Schoenhofer, of Wichita, argued the cause and was on the briefs for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, *Steve Six*, attorney general, and *Paul J. Morrison*, former attorney general, were with him on the briefs for appellee

*Kyle G. Smith*, assistant city attorney, was on the brief for *amicus curiae* City of Topeka Police Department.

The opinion of the court was delivered by

NUSS, J.: This case concerns the suppression of drugs discovered during a properly commenced traffic stop of a rented van by Deputy Henry Cocking. The van was being driven by Ronald O'Kelly, the 16-year-old son of defendant Ronnie Morlock, the van's lessee and sole passenger. The district court denied Morlock's motion to suppress. A majority panel of the Court of Appeals reversed, and Judge Leben dissented.

This court granted the State's request for review under K.S.A. 22-3602(e) on the following question:

"Did the Court of Appeals err by reversing the district court's denial of defendant's suppression motion when:
(1) United States Supreme Court precedent indicates Deputy Cocking did not violate defendant's rights during a lawful stop.
(2) Cocking had reasonable suspicion to justify an investigatory detention; and
(3) any taint was attenuated by [Morlock's] consent after the stop ended and the encounter became voluntary?"

We hold that Deputy Cocking's questions about the van occupants' travel plans did not exceed the acceptable boundaries of the traffic stop. We further hold that Cocking's taking of Morlock's driver's license to his patrol vehicle and using it to run a warrants check on the vehicle computer was justified by his reasonable suspicion, allowing an extension of the traffic stop. Accordingly, we do not address whether any taint was attenuated by Morlock's later consent to search.

We reverse the Court of Appeals and affirm the district court.

## FACTS

The essential facts are not in dispute and are primarily taken from the Court of Appeals' majority opinion.

In the early evening of February 3, 2006, Deputy Henry Cocking of the Sedgwick County Sheriff's department was driving east-

bound on Highway 54 when he observed a van with Arizona tags moving out in front of him. Cocking noticed the driver twice failed to signal when changing lanes. Cocking activated his emergency lights and stopped the van.

Cocking approached the driver of the van, 16-year-old Ronald O'Kelly, and told him the reason for the stop. Cocking asked O'Kelly to produce his driver's license. Cocking noticed that O'Kelly was very nervous: he was shaking and trembling and he dropped the license into his lap and then almost dropped it on the ground when he handed it over. Cocking also noticed that the passenger, Ronnie Morlock, was staring straight ahead at the dash and never looking at Cocking. This behavior struck Cocking as odd, because when he has previously made contact with people at their vehicle door, "their usual attention is on me."

Cocking asked O'Kelly to step out of the vehicle, and the two walked to the rear of the van. Cocking asked O'Kelly if the information on his driver's license—including his Overland Park, Kansas, address—was correct, and O'Kelly said, "Yes." Cocking then asked either "where he was going" or "where he was coming from." O'Kelly replied that he was coming from Phoenix and going to Kansas City. Cocking asked O'Kelly how long he had been in Phoenix and O'Kelly indicated a couple of days. Cocking asked O'Kelly why he was in Phoenix, and O'Kelly replied they were visiting his dad's girlfriend, indicating that his dad was the van's passenger. Cocking testified that perhaps because he asked for the vehicle registration, O'Kelly volunteered that the van was rented. O'Kelly also said the van was rented by his dad.

Cocking went to the passenger side of the van to obtain the rental agreement. He asked the passenger for his ID "to verify that was him." After obtaining the driver's license, he also asked Morlock for the rental agreement. According to Cocking, obtaining the rental agreement was like obtaining the registration, to "make sure they had authorization to have that vehicle."

While Morlock was looking for and eventually retrieving the rental agreement, Cocking asked him several questions. In response to Cocking's query of "where he was going or coming from," Morlock said he was coming from Phoenix and going back to Kan-

sas City. Morlock also said he "had flew to Phoenix from Kansas City" and "was going to meet a girl he had met on the internet." However, he had not been able to make contact with her. He also said he had been in Phoenix a couple of days.

Cocking reviewed the rental agreement and determined that the van was rented from Tucson, not from Phoenix. Cocking knew they were two different large cities, so he asked Morlock about the discrepancy. Morlock explained that he had flown into a "Phoenix/Tucson airport located right in that area." Cocking asked Morlock some additional questions. Morlock replied that while he flew to Phoenix, he did not have enough money to purchase a ticket to fly back, so he decided to rent a car.

Cocking felt the activity was suspicious. His opinion was based upon:

"the nervousness, the rental agreement. They went to Phoenix, they told me they flew to Phoenix for a couple of days, the rental agreement was out of Tucson. One-way rental, which is very expensive. It would cost just as much to fly back. And with a short trip, it's just definitely suspicious activity."

Cocking also testified he further found it suspicious that Morlock would fly one-way to Phoenix to see the woman and not even make contact with her, since seeing her was the purpose for the trip. He also thought it suspicious that O'Kelly would describe the female as his dad's girlfriend, and Morlock would instead describe her as someone he had simply met on the internet.

Cocking then took both driver's licenses and the rental agreement to his patrol vehicle. While walking past the van, Cocking looked into a rear window and noticed four bags in the cargo area. Cocking found the number of bags unusual because Morlock and O'Kelly had said they were in Phoenix for only a couple of days.

While in the patrol vehicle, Cocking wrote O'Kelly a warning citation and ran both names through his vehicle's computer for a warrant check. The rental agreement also "appeared to be in order."

When both names cleared the warrant check, Cocking returned to the passenger side of the van. Both Morlock and O'Kelly were seated inside. Cocking handed the documents to Morlock and

asked O'Kelly why he was not in school. O'Kelly replied he was "just taking a couple days off."

Cocking then stepped back and said, "Have a nice day, talk to you later. Have a nice day." He turned and walked one to two steps away from the van toward his patrol vehicle, and then turned and reapproached the van. The passenger window was still down. Cocking asked, "Hey, do you mind if I ask you a couple of questions?" Morlock and O'Kelly responded, "Yeah, go ahead."

Cocking asked them if they would step out of the van, and both complied. Cocking told the pair, "We have large amounts of drugs traveling up and down U.S. 54," and then asked, "Do you have any drugs or weapons in your car?" Morlock denied having drugs or weapons inside. Cocking then asked Morlock for permission to search the van; Morlock answered, "Yes."

Cocking asked Morlock if he could search his person for weapons, and Morlock agreed. The search turned up no weapons on him. After opening the rear of the van, Cocking opened one of the suitcases in the cargo area. He observed cellophane packages that he believed were packaged drugs. Cocking then arrested both Morlock and O'Kelly and called for backup. A drug dog indicated it smelled drugs at the rear door of the van. Law enforcement officers ultimately removed 113 pounds of marijuana from the van.

Morlock was charged with possession of marijuana with intent to sell, in violation of K.S.A. 65-4163(a)(3), and the failure to affix a drug stamp, in violation of K.S.A. 79-2504.

After Morlock filed a motion to suppress the evidence, the trial court held a hearing on the motion in conjunction with a bench trial. After hearing the evidence, the trial court found that the encounter between Cocking and Morlock was continuous essentially because Cocking had formed reasonable suspicion which was articulated to the court's satisfaction: after returning to the vehicle after the warrant check, Cocking "continued with the detention because his suspicion was aroused."

The trial judge gave the following reasons supporting his decision on reasonable suspicion: (1) driver O'Kelly's nervousness; (2) Cocking was told the trip originated in Phoenix, yet the rental agreement showed Tucson; (3) Morlock explained this discrepancy

by mentioning the "Phoenix/Tucson" airport; (4) O'Kelly described Morlock's female friend as his dad's "girlfriend," while Morlock described her only as "someone he met on the internet"; (5) the female was not contacted in Phoenix, even though Morlock had traveled from Kansas City for that express purpose; (6) the van was being driven pursuant to a one-way rental agreement; and (7) four pieces of luggage were packed for only 2 days in Phoenix.

Because the trial judge found that Morlock voluntarily consented to the search of the van during this appropriate extension of the detention, he held that no Fourth Amendment violation occurred. Accordingly, the judge overruled Morlock's motion to suppress the evidence and later found him guilty of both charges. The judge later sentenced Morlock to 18 months' probation with an underlying sentence of 15 months in prison.

On appeal, the majority of the Court of Appeals panel essentially held that Cocking improperly extended the stop. It reversed the trial court's denial of the motion to suppress and set aside Morlock's convictions. Judge Leben dissented. *State v. Morlock*, 40 Kan. App. 2d 216, 190 P.3d 1002 (2008).

Additional facts will be added as necessary to the analysis.

## ANALYSIS

### I.  *Standard of Review*

Our standard of review is well known:

"When reviewing a motion to suppress evidence, this court reviews the factual underpinnings of a district court's decision for substantial competent evidence and the ultimate legal conclusion drawn from those facts de novo. The ultimate determination of the suppression of evidence is a legal question requiring independent appellate review. [Citation omitted.] The State bears the burden to demonstrate that a challenged search or seizure was lawful. [Citation omitted.]" *State v. Moore*, 283 Kan. 344, 349, 154 P.3d 1 (2007).

Appellate court review of a search arising out of a traffic stop initially requires a determination on whether the stop began legally. Morlock concedes this point because his son committed a traffic violation, *i.e.*, failed to signal lane changes. See K.S.A. 22-2402(1); *Moore*, 283 Kan. at 349 (a traffic violation provides an objectively valid reason to effectuate a traffic stop, *i.e.*, articulable facts suffi-

cient to constitute reasonable suspicion). Instead, Morlock basically argues that Deputy Cocking exceeded the constitutionally permissible boundaries of a legally commenced stop generally as described in *Moore*:

" 'A law enforcement officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation. When the driver has produced a valid license and proof that he or she is entitled to operate the car, the driver must be allowed to proceed on his or her own way, without being subject to further delay by the officer for additional questioning.' " 283 Kan. at 351 (quoting *State v. Anderson*, 281 Kan. 896, 902, 136 P.3d 406 [2006]).

More specifically, Morlock agrees with the majority of the Court of Appeals panel. He argues that Cocking exceeded the stop's constitutionally permissible boundaries by (1) asking certain travel questions of driver O'Kelly and passenger Morlock and also (2) taking Morlock's driver's license to his patrol vehicle and using it to run a warrant check on the vehicle computer. Morlock contends that because these events impermissibly extended the stop, his consent to search given during that extension was therefore invalid.

## II. *Arizona v. Johnson*

We start our analysis with an advantage over the trial judge and the judges on the Court of Appeals panel. Specifically, we have access to a decision rendered by the United States Supreme Court after the majority and dissenting opinions in *State v. Morlock* were filed on August 29, 2008. On January 26, 2009, the Court filed *Arizona v. Johnson*, 555 U.S. 323, 172 L. Ed. 2d 694, 129 S. Ct. 781 (2009), an opinion authored by Justice Ginsburg for a unanimous court.

In *Johnson*, three police officers stopped a car after a license plate check revealed that the registration had been suspended for an insurance related violation, which can justify a citation under Arizona law. The car contained three occupants. At one officer's request, the driver got out and the officer began obtaining the driver's license and information about the vehicle's registration and insurance. Another officer, Trevizo, attended to Johnson who sat in the back seat.

Trevizo observed Johnson was wearing clothing consistent with membership in the Crips gang. While Johnson was seated, and in response to Trevizo's questions, he provided his name and date of birth but said he had no identification with him. He volunteered he was from Eloy, Arizona, a place Trevizo knew was home to a Crips gang. Johnson further told her that he had served time in prison for burglary and been out for about a year.

Trevizo wanted to question Johnson away from the other passenger to obtain information about the gang Johnson might be in, so she asked him to get out of the car. After he did so, she began to pat him down for officer safety. When she felt a gun butt near his waist, he struggled, and she placed him in handcuffs.

A divided panel for the Arizona Court of Appeals reversed the trial court's denial of Johnson's motion to suppress. As Justice Ginsburg summarized: "[T]hat court concluded, once Officer Trevizo undertook to question Johnson on a matter unrelated to the traffic stop, i.e., Johnson's gang affiliation, patdown authority ceased to exist, absent reasonable suspicion that Johnson had engaged, or was about to engage, in criminal activity." 555 U.S. at 332.

The Supreme Court observed, among other things, that under *Brendlin v. California*, 551 U.S. 249, 168 L. Ed. 2d 132, 127 S. Ct. 2400 (2007), "a passenger is seized, just as the driver is, 'from the moment [a car stopped by the police comes] to a halt on the side of the road.' " 555 U.S. at 332. The court ultimately reversed the Arizona Court of Appeals and remanded, holding that Johnson's pat-down was constitutional. It made several key points in its holding:

"A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave. See *Brendlin*, 551 U.S. at 258, 127 S. Ct. 2400. *An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.* See *Muehler v. Mena*, 544 U.S. 93, 100-01[, 125 S. Ct. 1465, 161 L. Ed. 2d 229] (2005)." (Emphasis added.) *Johnson*, 555 U.S. at 333.

The *Johnson* Court's reliance upon *Muehler v. Mena*, 544 U.S. 93, 161 L. Ed. 2d 229, 125 S. Ct. 1465 (2005), is instructive. There, Mena was handcuffed and detained in her residence during the execution of a search warrant which listed, among other sought items, deadly weapons and evidence of street gang membership. An Immigration and Naturalization Service officer had accompanied the officers executing the search warrant, and during Mena's detention she was asked for her name, date of birth, place of birth, immigration status, and immigration documentation.

The Ninth Circuit court of appeals had held that the officers violated Mena's Fourth Amendment rights by questioning her about her immigration status during the otherwise lawful detention without independent reasonable suspicion. The Supreme Court reversed, holding that the Ninth Circuit's assumption that the questioning constituted a discrete Fourth Amendment event was faulty because " 'mere police questioning does not constitute a seizure.' " 544 U.S. at 101.

The *Muehler* Court heavily relied upon its decision released 57 days earlier, *Illinois v. Caballes*, 543 U.S. 405, 160 L. Ed. 2d 842, 125 S. Ct. 834 (2005), where the Court held that, without more, a drug dog sniff performed during a lawfully commenced traffic stop did not violate the Fourth Amendment. The *Muehler* Court essentially held that law enforcement officers could ask questions unrelated to the purpose of a search—without reasonable suspicion— as long as the questions did not prolong the search:

"Because we held [in Caballes] that a dog sniff was not a search subject to the Fourth Amendment, *we rejected the notion that 'the shift in purpose' . . . was unlawful because it 'was not supported by a reasonable suspicion.'* Id. at 408, 125 S. Ct., at 836-838. Likewise here, the initial *Summers* detention [pursuant to the search warrant] was lawful; *the Court of Appeals did not find that the questioning extended the time Mena was detained.* Thus no additional Fourth Amendment justification for inquiring about Mena's immigration status was required." (Emphasis added.) 544 U.S. at 101.

In short, the *Muehler* Court's test of *"no* extension" of the detention's duration was expanded 4 years later by the *Johnson* Court to become a test of "no *measurable* extension." *Johnson* also eliminated any doubt that the *Muehler* rationale applied to traffic stops.

See *State v. Smith*, 286 Kan. 402, 184 P.3d 890 (2008); *United States v. Stewart*, 473 F.3d 1265 (10th Cir. 2007). *Johnson* therefore also confirmed that an officer's inquiries into matters unrelated to the justification for the stop did not necessarily require reasonable suspicion.

With this background, we now turn to analyzing Morlock's claim that Deputy Cocking exceeded the constitutionally permissible boundaries of the stop by (1) asking certain travel questions of driver O'Kelly and passenger Morlock and (2) taking Morlock's driver's license to his patrol vehicle and running a warrant check.

### III. *Specific travel plans*

The Court of Appeals majority acknowledged the existence of substantial authority specifically authorizing a law enforcement officer to inquire about a detained driver's travel plans during a traffic stop without unconstitutionally extending the scope of the stop. *State v. Morlock*, 40 Kan. App. 2d 216, 224, 190 P.3d 1002 (2008). It also acknowledged that "[a]lthough courts have uniformly held that a law enforcement officer may question a *driver* of a vehicle about travel plans, there is limited authority upholding such questioning of *passengers*." (Emphasis added.) 40 Kan. App. 2d at 225. Based upon its view of this research, the panel majority approved Cocking asking both driver and passenger where they were traveling to and from.

But while acknowledging some authority to the contrary allowing similar questions, *e.g.*, *United States v. Brigham*, 382 F.3d 500 (5th Cir. 2004), the majority disapproved the following questions by Cocking:

(1) asking the 16-year-old driver O'Kelly how long he had been in Phoenix and why he was there;

(2) asking passenger Morlock how long he had been in Phoenix, why he went there, and why after flying there he was instead driving back.

The majority held that these five questions were "not reasonably related in scope to the traffic infraction which justified the stop in the first place." 40 Kan. App. 2d at 230.

Judge Leben disagreed because Morlock's "claim that the officer couldn't ask limited questions about his travel plans is contrary both to the rationale of recent United States Supreme Court cases and to cases decided by courts elsewhere." 40 Kan. App. 2d at 237. We agree with Judge Leben that Cocking's five questions were constitutionally permissible.

(1) *The two questions to driver O'Kelly were permissible incidents to routine traffic stop*

We first conclude that the panel majority's disapproved questions of driver O'Kelly are permissible because they are not "inquiries into matters unrelated to the justification for the traffic stop." See *Arizona v. Johnson*, 129 S. Ct. 788.

The case of *United States v. Rivera*, 570 F.3d 1009 (8th Cir. 2009), is of particularly useful guidance because it was decided after the Supreme Court's decision in *Johnson*. During a traffic stop, the trooper explained the reason for the stop and asked for Rivera's driver's license and registration. He also inquired about the purpose of Rivera's trip, and Rivera answered that he was travelling to Memphis to pick up his family. The trooper asked what Rivera's family was doing in Memphis, and Rivera eventually confirmed that his wife went on a trip to visit her mother-in-law. Rivera also told the trooper that he was employed as a painter, and the trooper observed that Rivera had two cell phones with him in the truck.

About a minute and a half into the stop, they moved to the rear of the truck. The trooper continued to question Rivera about how his family got to Memphis and whether Rivera had previously been arrested. In response to the question of previous arrests, Rivera answered that he had been issued a ticket a few hours earlier, and presented it. When the trooper asked again about previous arrests, Rivera did not respond, instead giving more details about the ticket he had received. Among other things, the trooper asked where Rivera's mother-in-law lived in Memphis, and Rivera responded that he did not know. The trooper then inquired how Rivera would find his wife when he got to Memphis. After some additional in-

audible and confused responses, Rivera eventually said he would need to call her.

At about 4½ minutes into the stop, the trooper asked whether Rivera had guns or anything illegal in the truck. When Rivera answered, "No," the trooper asked if he could search the truck. Rivera said, "Yeah," and the trooper again confirmed, "You don't mind if I search the vehicle?" Rivera responded, "You can look in." 570 F.3d at 1011. The trooper then instructed Rivera to sit in the front seat of the patrol car, where he continued to question Rivera about how he was going to contact his family once he arrived in Memphis.

Six minutes into the traffic stop, the trooper provided Rivera's personal information for a records check. While waiting for the results, the trooper continued to ask where Rivera purchased the truck, when he began his trip to Memphis, and how he was going to meet his family in Memphis. Over the next 2½ minutes, the trooper briefly asked again if Rivera had a phone number for a family member in Memphis and inquired about Rivera's employer.

Fourteen minutes into the stop the trooper received the records information, two minutes later, Rivera withdrew his consent, and a drug dog later located cocaine in Rivera's truck.

The Eighth Circuit rejected Rivera's argument that the stop was unreasonably prolonged during the first 15 minutes by the trooper's mixing drug-interdiction questions with routine traffic stop inquiries. As for the first 4 to 6 minutes of the stop, the *Rivera* court concluded that

"much of [the] exchange with Rivera related to the traffic stop. He requested Rivera's license and registration, explained the reason for the stop, and *inquired into the destination and purpose of Rivera's trip*, his criminal history, and the details of his previous traffic ticket earlier that day. *These are permissible incidents of a routine traffic stop. United States v. Long*, 532 F.3d 791, 795 (8th Cir. 2008); *Peralez*, 526 F.3d at 1119." (Emphasis added.) 570 F.3d at 1013.

Like the Eighth Circuit, we too hold that such travel questions are "permissible incidents to a routine traffic stop." *Cf.* K.S.A. 22-2402 (in *Terry* stop, officer may demand, *inter alia*, an explanation of the person's actions). These types of questions were permissible in a number of jurisdictions, including Kansas, even before *Arizona*

*v. Johnson.* Moreover, the Eighth Circuit's failure to include *Johnson* in its analysis of this particular issue strongly suggests that court did not believe that *Johnson* influenced its determination of whether these were "matters unrelated to the justification for the traffic stop." See 555 U.S. at 333.

The Tenth Circuit's approach to this issue before *Johnson* was similar to the Eighth Circuit's today. In *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1256 (10th Cir. 2006), in response to a Kansas deputy's questions, the driver answered that "he lived in New York, had traveled to California, had stayed there 1 and ½ days, had purchased the car, and was en route back to New York." The court clearly held that the deputy "asked only a few questions about travel plans and vehicle ownership before going to his patrol car to issue a warning. *Such limited questioning is proper, because an officer may routinely ask about travel plans* and ownership during a lawful traffic stop. See *Bradford*, 423 F.3d at 1156." (Emphasis added.) 441 F.3d at 1259.

Similarly, in *United States v. Williams*, 271 F.3d 1262 (10th Cir. 2001), the officer asked about the driver's travel plans during the initial approach to the vehicle and while holding the driver's license and a rental agreement. The driver replied that although his sister was from Chicago, she had traveled from Chicago to Kansas City with a friend. He explained that his family was having an Easter gathering the following day in Denver, and due to his sister's fear of flying, he was driving to Kansas City to pick her up and bring her to Denver. The Tenth Circuit rejected the driver's challenge to the questions, holding that "questions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop." 271 F.3d at 1267; see *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000) (stating that "questions about travel plans are routine and 'may be asked as a matter of course without exceeding the proper scope of a traffic stop.' "); *State v. Moore*, 283 Kan. 344, 347, 154 P.3d 1 (2007) (although apparently not raised as an issue on appeal by the driver defendant, when questioned about his travel plans he stated that "he had gone to Las Vegas for an army airborne reunion").

The Fifth Circuit has provided its rationale for allowing such questions in *United States v. Brigham*, 382 F.3d 500, 508 (5th Cir. 2004): "An officer may also ask about the purpose and itinerary of a driver's trip during the traffic stop. [Citation omitted.] Such questions may efficiently determine whether a traffic violation has taken place, and if so, whether a citation or warning should be issued or an arrest made." (Citing to *United States v. Holt*, 264 F.3d 1215, 1221 [10th Cir. 2001] [en banc]).

For these reasons, we hold that Deputy Cocking's travel questions of O'Kelly—how long he had been in Phoenix and why he was there—were proper because they were permissible incidents to a routine traffic stop.

(2) *The three questions to passenger Morlock did not measurably extend the stop*

The record reveals that Cocking's entire discussions with O'Kelly and Morlock before the warrant checks, including all of the admittedly legitimate questions as well, took only 2 minutes. We independently observe that Cocking's questions to Morlock, concerning where he was going or coming from, why he had gone to Phoenix, and why after flying there he was instead driving back in a rented van, were apparently asked while Morlock was looking for the rental agreement.

"[Defense Counsel]: You went to Mr. Morlock's window because you wanted to obtain the lease agreement; correct?

"[Cocking]: That's correct.

"[Defense Counsel]: All right. But while there, you asked much more than just, 'May I have the lease agreement,' correct?

"[Cocking]: That's correct.

"[Defense Counsel]: All right. Further delaying the stop or allowing him to leave. There is delay there, correct?

"[Cocking]: *Just getting information while he was reaching and finding the rental agreement, I was asking those questions.*" (Emphasis added.)

The panel majority effectively admitted that Cocking's request to see the rental agreement and Morlock's hunt for it are undeniably permissible incidents of the routine traffic stop. See *United States v. Brigham*, 382 F.3d at 507-08 (no constitutional impedi-

ment to an officer requesting to examine driver's license, vehicle registration, or rental papers); *United States v. Garcia*, 167 Fed. Appx. 737, 740 (10th Cir. 2006) (finding no violation in asking passenger for registration papers after determining driver could not show he was "entitled to operate the vehicle"); *cf. State v. Moore*, 283 Kan. 344, Syl. ¶ 4 (officer conducting routine traffic stop may request driver's license and vehicle registration as proof that driver is entitled to operate the vehicle).

Because the three questions were asked during the concededly legitimate hunt for the agreement, they could not have "measurably extended" the stop. *Arizona v. Johnson*, 555 U.S. 323, 172 L. Ed. 2d 694, 129 S. Ct. 781 (2009) (questioning passenger and subsequent patdown performed concurrent with another officer's obtaining from driver his license, registration, and insurance); see *Alcaraz-Arellano*, 441 F.3d at 1259 (because trooper wrote warning ticket in patrol car while asking driver questions not limited to travel plans and vehicle ownership, no extension); *United States v. Purcell*, 236 F.3d 1274, 1280 (11th Cir. 2001) (question regarding weapons did not extend the duration of the stop because was asked while officer was still writing out the citation and awaiting the results of a computer check); *United States v. Crain*, 33 F.3d 480, 485 (5th Cir. 1994) ("[w]hen questioning takes place while officers are waiting for the results of a computer check—and therefore does not extend the duration of the stop—the questioning does not violate *Terry*").

We acknowledge that the record is not crystal clear on whether Cocking's question—why after flying to Phoenix Morlock was instead driving a rental van back to Kansas City—was asked concurrent with the search for the rental agreement or after Cocking reviewed it. But assuming the question was asked later, we observe that Cocking, the trial judge, and Judge Leben all found the one-way aspect of the rental as contributing to reasonable suspicion. See *United States v. Wood*, 106 F.3d 942, 946-47 (10th Cir. 1997) (unusual travel plan or inconsistent information can contribute to reasonable suspicion); *cf. United States v. Bradford*, 423 F.3d 1149, 1157-58 (10th Cir. 2005) (reasonable suspicion based in part upon "the financial illogic of purchasing a series of one-way plane tickets

and one-way car-rentals"). The mere use of rental vehicles, one-way or otherwise, has been considered as contributing to reasonable suspicion because they are "often used by narcotics traffickers." *United States v. Contreras*, 506 F.3d 1031, 1036 (10th Cir. 2007).

We agree with Judge Leben's analysis, particularly given Cocking's testimony that based upon his training and education, drug smugglers "fly down," rent a car, pick up the drugs, and then transport the drugs. " 'That's definitely a warning sign that should go off in your head about drug interdiction.' " 40 Kan. App. 2d at 258. Judge Leben ultimately gave considerable weight to Cocking's testimony about the "fly, then rent" factor, emphasizing Cocking's overall law enforcement experience, especially his recent experience with drugs. As we ruled in *State v. Moore*, an appellate court makes its determination on whether reasonable suspicion exists "with deference to a trained law enforcement officer's ability to distinguish innocent and suspicious circumstances [citation omitted], remembering that reasonable suspicion represents a 'minimum level of objective justification' which is 'considerably less than proof of wrongdoing by a preponderance of the evidence.' " 283 Kan. at 354.

In short, the five travel questions—asking O'Kelly and Morlock each how long they had been in Phoenix and why they were there, and asking Morlock why after flying there he was instead driving back—were constitutionally permissible.

## IV. *Warrants check on Morlock*

The panel majority in the instant case additionally disapproved of Deputy Cocking taking passenger Morlock's driver's license to his patrol vehicle and also then using it to check for outstanding arrest warrants on his computer. Judge Leben disagreed because Morlock's "claim about the warrant check is precluded by recent United States Supreme Court cases interpreting the Fourth Amendment." 40 Kan. App. 2d at 237. We agree with Judge Leben that these particular Cocking actions were constitutionally permissible. Specifically, any extension of the stop was based upon Cocking's reasonable suspicion. See *Moore*, 283 Kan. at 350 (appellate

court reviews to determine if substantial competent evidence supports the district court findings but reviews de novo the legal conclusion—reasonable suspicion—as a question of law).

An officer is not required to disregard information which may lead him or her to suspect independent criminal activity during a traffic stop. When "the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions." *United States v. Barahona*, 990 F.2d 412, 416 (8th Cir. 1993); see also *United States v. Pereira-Munoz*, 59 F.3d 788, 791 (8th Cir. 1995) (When officers develop reasonable, articulable suspicion of criminal activity during a traffic stop, they have " ' "justification for a greater intrusion unrelated to the traffic offense" ' " and are "permitted 'to graduate their responses to the demands of their particular situation.' ").

As an aside, we observe that the fact the computer checks eventually turned up no outstanding warrants does not automatically mean that Deputy Cocking lacked legally sufficient suspicion to conduct the checks in the first place. See *United States v. Jenson*, 462 F.3d 399, 404 (5th Cir. 2006).

Cocking testified without refutation that before he asked the two travel questions of O'Kelly that the panel majority disapproved, he was aware of previous narcotics arrests on Highway 54. He also found "the nervousness" suspicious. He testified that he noticed O'Kelly's nervousness—shaking and trembling, dropping his license into his lap, and almost dropping it to the ground when handing it to Cocking. He did admit, however, that some young drivers, like O'Kelly, may be nervous when stopped by an officer. The trial court noted O'Kelly's nervousness as contributing to its ultimate determination of reasonable suspicion to extend the stop. Judge Leben acknowledged its appearance in the reasonable suspicion calculus. See *Moore*, 283 Kan. 344 (driver's nervousness can contribute to reasonable suspicion). Cocking also noticed Morlock, whose identity was yet unknown, looking straight ahead at the dash while Cocking talked to O'Kelly. He testified that he found Morlock's behavior odd. See *United States v. Brigham*, 382 F.3d at 508

(officer's "increasing suspicion was also fueled by . . . [driver's] . . . avoidance of eye contact").

Cocking testified, also without refutation, that he then learned the following: the van was rented, it was rented by O'Kelly's father, and the father was the one staring intently at the dash. Judge Leben especially branded Morlock's lack of paternal reaction as strange and suspicious: "What dad would rigorously try to avoid eye contact with the officer by only looking forward when his [16-year-old] son had been pulled over?" 40 Kan. App. 2d at 256.

Cocking testified to other factors that contributed to his reasonable suspicion. These factors included the later-learned discrepancy about where the van was rented. Morlock told Cocking the van was rented in Phoenix, but the rental papers showed Tucson, which Judge Leben noted was 116 miles from Phoenix. When Cocking asked Morlock why he would fly to Phoenix and rent a van from Tucson, he explained that "he got it at the Phoenix/Tucson Airport" and "[i]t's all right there in one location, and that's where we rented the vehicle." Based upon Cocking's testimony, the trial judge found these both aroused Cocking's suspicions and thus contributed to the judge's eventual finding of reasonable suspicion. Judge Leben found this explanation merely poured gasoline on Cocking's "inferno of suspicion." 40 Kan. App. 2d at 257; *cf. State v. DeMarco*, 263 Kan. 727, 739, 952 P.2d 1276 (1998) (discrepancies in travel plans can contribute to reasonable suspicion); *United States v. McRae*, 81 F.3d 1528, 1534-35 (10th Cir. 1996) (apparent contradiction between dates on defendant's car rental agreement and alleged travel plans contributed to reasonable suspicion).

Cocking further found suspicious the discrepancies on whether father and son were going to see Morlock's girlfriend or simply a woman Morlock met on the internet, and whether they actually saw the woman. O'Kelly told him they were in Phoenix "visiting his dad's girlfriend" while Morlock said they "didn't make contact with" the internet woman. The trial judge found the uncertainty about Morlock's relationship with the woman an inconsistency that contributed to Cocking's suspicion. Judge Leben also found the inconsistency significant. See *United States v. Zubia-Melendez*, 263

F.3d 1155, 1162 (10th Cir. 2001) (dubious or inconsistent answers can contribute to reasonable suspicion).

When Cocking appropriately asked Morlock why—after flying to Phoenix—he instead rented a van to return to Kansas City, Morlock replied he did not have the money to buy plane tickets. Cocking additionally found suspicious the combination of "taking a one-way flight to Phoenix to visit a woman but then not make contact at all," and then renting a van to return to Kansas City because of a money shortage. 40 Kan. App. 2d at 256. Cocking testified he believed that one-way vehicle rentals are very expensive too: it "would cost just as much to fly back." The trial judge found both factors contributed to his finding reasonable suspicion, first noting that "this person was not even contacted in Phoenix, even though they traveled all the way from Kansas City to Phoenix for that stated purpose." Judge Leben agreed. As mentioned, the trial court next noted "the one-way rental agreement" supported his finding of reasonable suspicion, and Judge Leben found this fact particularly significant, given Cocking's testimony based upon his training and education about the drug smugglers' "fly, then rent" method. *Cf. United States v. Bradford*, 423 F.3d at 1157-58 (reasonable suspicion based in part upon "the financial illogic of purchasing a series of one-way plane tickets and one-way car-rentals").

Cocking also testified that the short duration of the trip contributed to his suspicion, particularly given the flight to Phoenix and the driving of an expensive rental van back to Kansas City 2 days later. Short duration was acknowledged by Judge Leben as a factor in the calculus, and we agree. 40 Kan. App. 2d at 256; see *United States v. Contreras*, 506 F.3d at 1036 (Contreras drove 1,200 miles to see her family, only to turn around within a day and begin the 1,200 mile drive back—"seemed suspicious at best and incredible at worst."); *United States v. Alcaraz-Arellano*, 441 F.3d at 1260 (implausible travel plans can form a basis for reasonable suspicion).

We conclude as a matter of law that this information known to Cocking, coupled with his 15-year experience in law enforcement and recent experience with drug interdiction, is sufficient to justify taking Morlock's license to the patrol vehicle and using it to run a warrant check. See *Moore*, 283 Kan. 350 (appellate court reviews

to determine if substantial competent evidence supports the district court findings but reviews de novo the legal conclusion—reasonable suspicion—as a general question of law). We expressly do not consider in our calculus the factor of the four bags in the van, only because as the panel majority pointed out, Cocking acquired that information after he had already decided to take Morlock's license to his patrol vehicle.

Finally, Morlock's counsel has submitted a letter under Rule 6.09(b) (2008 Kan. Ct. R. Annot. 47) contending that a July 17, 2009, opinion of the Court of Appeals, *State v. Diaz-Ruiz*, 42 Kan. App. 2d 325, 211 P.3d 836 (2009), contains persuasive rationale. Morlock argues that Cocking failed to comply with the legal statement contained in that opinion's Syl. ¶ 1 which provides:

"When analyzing whether an officer's actions have exceeded the scope or duration of a traffic stop, the court considers whether the officer diligently pursued a means of investigation that was likely to confirm or dispel the officer's suspicions quickly, during which time it was necessary to detain the defendant." 42 Kan. App. 2d 325, Syl. ¶ 1.

More particularly, Morlock argues that Cocking did not "diligently" pursue the investigation to "quickly" address his suspicions because he did more than simply obtain O'Kelly's driver's license, run a computer check on him, and write a citation.

Morlock's contention is best addressed by simply noting we earlier held that Cocking developed increasing amounts of suspicion during the stop. This warranted his continued investigation which resulted in an increase in detention length. We cannot say Cocking failed to diligently pursue his investigation to quickly address his suspicions, especially when, as Judge Leben points out, the entire stop took only 12 minutes. See 40 Kan. App. 2d at 243.

The decision of the Court of Appeals is reversed. The decision of the district court is affirmed.