Biles, J.,
concurring in part and dissenting in part: I agree with the portion of the majority’s opinion holding it was error to allow the State to rely on the horizontal gaze nystagmus (HGN) test results to establish reasonable suspicion for the officer’s request for a preliminaiy breath test (PBT) because the State has not established the test’s reliability as required by State v. Witte, 251 Kan. 313, 836 P.2d 1110 (1992). But I disagree with what the majority characterizes as a harmless error analysis in which the majority concludes the remaining evidence failed to independently establish the required reasonable suspicion to satisfy K.S.A. 2010 Supp. 8-1012(b). I would affirm the district court and the Court of Appeals on this point and affirm the conviction. I believe the majority is setting a standard higher than what reasonable suspicion requires.
This court recently considered whether an officer had reasonable suspicion to request a PBT in State v. Edgar, 296 Kan. 513, 294 P.3d 251 (2013). There we noted “[reasonable suspicion is a less demanding standard than probable cause and requires considerably less than a preponderance of the evidence.” 296 Kan. at 521 (citing State v. Pollman, 286 Kan. 881, Syl. ¶ 6, 190 P.3d 234 [2008]). We defined “reasonable suspicion” as
“ ‘ “a particularized and objective basis for suspecting the person stopped is involved in criminal activity. Something more than an unparticularized suspicion or hunch must be articulated. Reasonable suspicion can arise from information that is less rehable than that required to show probable cause. Both reasonable suspicion and probable cause are dependent upon the content of information pos *270 sessed by tire detaining authority and the information’s degree of reliability. Quantity and quality are considered in the totality of the circumstances—the whole picture that must be taken into account when evaluating whether there is reasonable suspicion.’ ” [Citations omitted.]” (Emphasis added.) 296 Kan. at 521.
As that standard suggests, we review reasonable suspicion determinations by considering the totality of the circumstances—as viewed by a reasonable law enforcement officer. More specifically, we determine
“whether reasonable suspicion exists ‘with deference to a trained law enforcement officer’s ability to distinguish innocent and suspicious circumstances [citation omitted], remembering that reasonable suspicion represents a “minimum level of objective justification” which is “considerably less than proof of wrongdoing by a preponderance of the evidence.” ’ ” (Emphasis added.) State v. Morlock, 289 Kan. 980, 995, 218 P.3d 801 (2009) (quoting State v. Moore, 283 Kan. 344, 354, 154 P.3d 1 [2007]).
The Court of Appeals panel concluded reasonable suspicion existed because of Molitor’s “striking of the curb, very strong odor of alcohol, bloodshot and watery eyes, admission to drinking beer, losing balance during instruction phase of [the] walk-and-turn test, and putting [his] foot down on the one-leg-stand test.” City of Wichita v. Molitor, 46 Kan. App. 2d 958, 967, 268 P.3d 498 (2012). But in doing so, it also acknowledged and considered tire evidence in the record supporting the conclusion that Molitor was not intoxicated, noting he “was able to speak without slurring his words, produced his identification without difficulty, and had only one clue each on the walk-and-tum test and tire one-leg-stand test.” 46 Kan. App. 2d at 967.
In Edgar, we held field sobriety test results administered before the PBT is requested should be considered when deciding whether reasonable suspicion existed to request the PBT. 296 Kan. at 525. But, as we recognized in Edgar, tire driver s successful performance on a field sobriety test does not necessarily dispel an officer s reasonable suspicion. 296 Kan. at 524 (citing several cases holding reasonable suspicion was not dispelled by driver s perfect or adequate performance on sobriety testing); see also Smith v. Kansas Dept. of Revenue, 291 Kan. 510, 513-15, 242 P.3d 1179 (2010) (defendant’s positive facts did not negate other facts in determining *271 whetlier the trooper should have requested the PBT or evidentiaiy breath test).
But the majority for the first time in our caselaw establishes two classes of evidence and assigns greater weight to the standardized field sobriety tests, i.e., the walk-and-turn and one-leg stand tests. In its view, the officer’s “subjective observations” that Molitor was intoxicated, i.e., the perceived strength of the alcohol odor or the driver’s bloodshot and watery eyes, as a matter of law are “offset” by the “objective indications” that he was not, i.e., field sobriety tests in which Molitor did not exhibit enough indicators of intoxication to predict from the tests that he was unlawfully impaired. 301 Kan. 266-67.
The rationale for giving die officer’s observations lesser weight— that “an officer’s sensory perceptions, such as the strength of the alcohol odor or the condition of the driver’s eyes, are subject to an imprecise personal opinion”—necessarily applies in every case. See 301 Kan. at 267. This suggests the majority’s analysis will require its comparative weighting in all future cases. Are we to believe that an officer’s observation that the driver had slurred speech or fumbled for a driver’s license will similarly be termed a “subjective observation” and given less weight? If so, this has never been our caselaw, as mostly recently rejected in Edgar, 296 Kan. at 523-24.
Similarly, the majority discounts Molitor’s on-site admission to tire investigating officer that he had been drinking “approximately two or three beers.” The majority then concludes this admission refutes the officer’s reasonable suspicion because “it is questionable whether two or three beers would raise tire alcohol concentration in the breath or blood of a normal size man to .08 or more.” 301 Kan. at 267. Such an analysis is obviously marred by a number of assumptions, most notably that the driver truthfully reported how many drinks he “approximately” had. Moreover, the record contains no evidence regarding Molitor’s body size, how many ounces would constitute a beer, or the size of tire bottle or glass.
I fail to see how the majority’s conjecture about normal body size or the quantity and effects of consumption negates Molitor’s admission that he was drinking. It also tramples on the deference our caselaw says should be given to the officer about what that *272 admission might have meant in light of the officer s other observations, i.e., die strong odor of alcohol, Molitor s bloodshot and watery eyes, and his impaired driving skills. Reasonable suspicion, after all, is determined by looking at the totality of circumstances as viewed by a reasonable law enforcement officer. Edgar, 296 Kan. at 521 (citing Pollman, 286 Kan. at 890).
K.S.A. 2010 Supp. 8-1012(b) allows a law enforcement officer to “request a person who is operating or attempting to operate a vehicle within this state to submit to a preliminary screening test of the person’s breath to determine the alcohol concentration of the person’s breath if the officer has reasonable suspicion to believe the person has been operating or attempting to operate a vehicle while under the influence of alcohol or drugs or both alcohol and drugs.” (Emphasis added.) In Kansas, driving under the influence includes operating or attempting to operate any vehicle within this state while (1) the alcohol concentration in the operator’s blood or breath is .08 or more; or (2) under the influence of alcohol to a degree that renders the person incapable of safely driving a vehicle. K.S.A. 2010 Supp. 8-1567 (a)(1) and (a)(3). The PBT authorized by K.S.A. 2010 Supp. 8-1012(b) is simply an investigatory step toward determining whether the crime of DUI may be established. Edgar, 296 Kan. at 520.
Recounting then the circumstances that for me supply a “minimum level of objective justification” for the PBT as explained in Edgar, 296 Kan. at 521, I would cite: (1) Molitor’s admission of alcohol consumption; (2) the strong odor of alcohol on Molitor during the traffic stop; (3) Molitor’s watery and bloodshot eyes; (4) Molitor driving his vehicle into the curb while pulling over and stopping the vehicle with the right front tire halfway up tire curb; and (5) the indicators of impairment Molitor displayed during field sobriety tests when he lost his balance during the instruction phase of the walk-and-turn test and put his foot down on the one-leg-stand test. In short, the officer observed evidence indicating impaired driving and intoxication and was justified under the statute to request the PBT.
*273 For these reasons, I would affirm the conviction based on the officer s reasonable suspicion to request a PBT even without the HGN test results.
Nuss, C.J., and Rosen, J., join in the foregoing concurring and dissenting opinion.