NOT DESIGNATED FOR PUBLICATION

No. 120,794

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

V.

JENNIFER D. GRIFFITH,
*Appellee*.

MEMORANDUM OPINION

Appeal from Reno District Court; TRISH ROSE, judge. Opinion filed January 24, 2020. Affirmed.

*Andrew R. Davidson*, assistant district attorney, *Keith Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellant.

*Shannon S. Crane*, of Hutchinson, for appellee.

Before ARNOLD-BURGER, C.J., GREEN and BUSER, JJ.

GREEN, J.:  Jennifer Griffith was a passenger in a car driven by Steven Griffith. Officer Hannah Brown of the Hutchinson Police Department stopped the car for an illegal license plate decal. Officer Brown discovered that Steven was driving with a suspended license and that the car lacked insurance or proper registration. During the stop, Officer Brown requested Jennifer's driver's license and ran a warrant check. Officer Brown thus discovered that Jennifer had an outstanding warrant and arrested her. After arresting Jennifer, Officer Brown searched Jennifer's purse and found contraband. The State charged Jennifer with possession of methamphetamine, possession of drug

1

paraphernalia, and possession of marijuana. Jennifer moved to suppress the evidence from her purse, arguing that the warrant check was an unlawful search. The trial court suppressed the evidence. The State timely appealed. For the reasons stated later, we affirm.

On March 7, 2018, while patrolling the streets of Hutchinson, Kansas, Officer Brown noticed a car with an illegal decal on its license plate. She turned on her car's emergency lights and stopped the car. Steven Griffith was driving the car and Jennifer Griffith was sitting in the passenger seat. Officer Brown walked to the driver's side of the car; she spoke with Steven and took Steven's driver's license back to her car.

Officer Brown discovered that Steven had a suspended license. Officer Brown returned to the Griffiths' car and told Steven he had a suspended driver's license for a previous car accident where he had no car insurance. She told Steven she would check if he had any failures to appear on his record. If he had any previously failed to appear citations, Officer Brown would arrest him. On the other hand, if he had no previously failed to appear citations, he would be released with only a citation. All of this happened within the first 4 minutes and 30 seconds of Officer Brown's bodycam footage of the stop.

Before checking with dispatch about any past failures to appear by Steven, Officer Brown asked Jennifer for her driver's license at about 4 minutes and 30 seconds into the stop. According to Officer Brown, she did so "[t]o see if we would be able to release the vehicle to [Jennifer]," but Officer Brown did not tell Jennifer why she wanted her driver's license. Jennifer never asked Officer Brown to release the car to her. According to Officer Brown, at this point she was not investigating any crimes, only the three traffic violations. Officer Brown also indicated that when she asked Jennifer for her driver's license, she did not have any reasonable suspicion that Jennifer was involved in criminal activity. After Officer Brown asked for Jennifer's driver's license, but before Jennifer

2

produced her license, Steven told Officer Brown that he did not have any insurance on the car.

Jennifer then gave Officer Brown her driver's license. Officer Brown gave dispatch Jennifer's driver's license number. Officer Brown told the couple that another police officer was also coming to the scene "just because of your license being suspended, ok?" Steven asked how long his driver's license had been suspended, and Officer Brown responded: "Let me get her returned, see if her [driver's] license isn't suspended, um, and then I'll be able . . . I'll have dispatch advise when it was suspended." Officer Brown continued talking with Steven. She asked him if he knew what was going on with his tags and he continued to insist he did not know why his driver's license was suspended.

About 6 minutes and 40 seconds into the stop, and 1 minute and 40 seconds after Jennifer produced her driver's license, Officer Brown told Jennifer she had an outstanding warrant. Officer Brown had Jennifer get out of the car, patted her down, put her in handcuffs, and put her in the back of her police car. Officer Brown did not contact dispatch to ask about any failures to appear by Steven until she had run the warrant search on Jennifer, discovered the warrant, and arrested Jennifer, which took about four minutes. Officer Brown then returned to check on the Griffiths' car decal while waiting to hear about Steven's potential failures to appear. About four minutes later, another police officer arrived. Then, 10 seconds after the other police officer arrived, Officer Brown told Steven she would "have to take [him] in." The second police officer arrested Steven for driving while his driver's license was suspended, having no proof of liability insurance, and displaying an illegal car tag.

Next, when Officer Brown walked back to the police car, she told Jennifer that the police would tow the Griffiths' car, and she asked Jennifer if she wanted Officer Brown to retrieve her purse out of the Griffiths' car. And Jennifer said, "Yeah."

3

Officer Brown retrieved Jennifer's purse out of the car to take it to the jail with Jennifer. When Officer Brown searched the purse, she found a glass pipe with residue, two syringes, and at least one small bag containing a "crystalline substance," and a container holding a green leafy substance. One of the items later tested positive for methamphetamine.

The State charged Jennifer with possession of methamphetamine, possession of drug paraphernalia, and possession of marijuana. Jennifer moved to suppress the evidence found in her purse. The trial court held a hearing on the motion to suppress.

Jennifer argued that Officer Brown had illegally seized her. She further argued that Officer Brown's decision to ask Jennifer for her driver's license and run her name for warrants unreasonably exceeded the scope of the traffic stop without reasonable suspicion that Jennifer was committing a crime. She also argued that she did not consent to a search of her purse and that Officer Brown did not tell her that the purse would be searched if Jennifer agreed to remove it from the car and take it with her to jail. Further, she argued that she never asked Officer Brown to release the car to her and that Officer Brown "had no reason to ask for a driver's license to begin with."

Jennifer also argued that the attenuation doctrine should not apply to allow admission of the evidence because her preexisting warrant did not sufficiently attenuate Officer Brown's unlawful seizure. Moreover, Officer Brown's unlawful seizure was a result of "flagrant" police misconduct which violated her rights under the Fourth Amendment to the United States Constitution because it is the Hutchinson Police Department's policy to request identification "and other related information" from pedestrians in the "absence of reasonable suspicion, probable cause." Jennifer admitted a copy of the Hutchinson Police Department policy on vehicle and pedestrian stops as evidence. Officer Brown stated this about the policy:

4

"Q. [by Jennifer's counsel]: And in your experience would it be routine for, you know, pursuant to your training to routinely run passengers for identification checks?

"A. Sometimes, yeah.

"Q. Okay.

"A. We ask but if they tell us, no, it's a no.

"Q. Okay. Is it your policy to inform the individuals; and when I say your policy, Hutchinson Police Department's policy; to inform individuals why you're requesting their driver's license?

"A. Just to I.D. them. In context, just asking somebody in this context, I was seeing if she was had a valid license."

"Q. Okay. So—and you also ran her for wants and warrants; is that correct?

"A. Yeah."

The State argued that Officer Brown did not unlawfully extend the stop by asking for Jennifer's driver's license because when she asked for her license, Officer Brown was still waiting to hear from dispatch as to whether Steven had any failures to appear citations and, therefore, whether Steven would be arrested. The State also argued that when Officer Brown took Jennifer's driver's license, she was still investigating whether the car was insured and whether Jennifer could legally drive the car away if Steven was arrested. Finally, the State argued that even if the trial court found the initial seizure was unlawful, the "discovery of the preexisting arrest warrant would attenuate any unconstitutional conduct." The State introduced as evidence Officer Brown's bodycam footage of the stop.

In granting Jennifer's motion to suppress, the trial court ruled:

"Defendant said nothing during this stop until the officer addressed her, asking for her license. Defendant was in a vehicle, Officer Brown was at the driver's window, in uniform. Defendant was not told she could refuse the request. Defendant was not told she was free to leave. The encounter with defendant was not voluntary. Officer Brown's

5

stated justification for detaining defendant and checking her license was to determine whether to release the car to defendant. Officer Brown knew the car had an invalid registration and was uninsured. The court does not find this explanation plausible. With no explanation as to why defendant was detained the court must conclude the purpose was to check for warrants. If the purpose of the license check is a warrant check the warrant is not an intervening circumstance. No attenuation occurred to prevent application of the exclusionary rule."

The State timely appealed the trial court's suppression ruling.

*Did the Trial Court Err by Granting Jennifer's Motion to Suppress?*

"The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, and Section 15 of the Kansas Constitution Bill of Rights prohibit unreasonable searches and seizures, and a warrantless search is per se unreasonable unless it falls within a recognized exception." *State v. Ramirez*, 278 Kan. 402, 404-05, 100 P.3d 94 (2004).

"When evidence is illegally obtained, its suppression may be warranted under the exclusionary rule, which is a judicially created rule that safeguards against unconstitutional searches and seizures by suppressing illegally seized evidence as a deterrent to future violations." *State v. Powell*, 299 Kan. 690, 694-95, 325 P.3d 1162 (2014). When a defendant moves to suppress evidence as the fruit of an illegal search, it is the State's burden to establish the lawfulness of the search. *State v. Reiss*, 299 Kan. 291, 296, 326 P.3d 367 (2014).

Here, Jennifer moved to suppress the evidence Officer Brown found while searching her purse. Jennifer argued that the evidence found in her purse was the "fruit of the poisonous tree" because Officer Brown's request for Jennifer's driver's license was illegal. See *Wong Sun v. United States*, 371 U.S. 471, 487-88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). The trial court suppressed the evidence because it concluded that Officer

6

Brown had illegally seized Jennifer when she asked for her driver's license. The trial court also concluded that Officer Brown's later discovery of Jennifer's preexisting warrants did not attenuate the illegal seizure so as to prevent exclusion of the evidence.

On appeal, the State gives two alternate reasons why the evidence should not have been suppressed. First, the State argues that Officer Brown's seizure of Jennifer was a lawful part of the initial traffic stop because "Officer Brown was doing her diligence to discover if the defendant would be able to legally drive the car with a valid driver's license, or if the car was required to be towed." Second, the State contends that even if the seizure was illegal, "the doctrine of attenuation should allow the evidence to be admissible."

> "When reviewing a motion to suppress evidence, this court reviews the factual underpinnings of a district court's decision for substantial competent evidence and the ultimate legal conclusion drawn from those facts de novo. The ultimate determination of the suppression of evidence is a legal question requiring independent appellate review." *State v. Moore*, 283 Kan. 344, 349, 154 P.3d 1 (2007).

"Substantial competent evidence is 'such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion.'" *Smith v. Kansas Dept. of Revenue*, 291 Kan. 510, 514, 242 P.3d 1179 (2010) (quoting *Drach v. Bruce*, 281 Kan. 1058, Syl. ¶ 2, 136 P.3d 390 [2006]).

*Was the Seizure of Jennifer Lawful?*

Generally, for Fourth Amendment analyses, encounters between law enforcement and the public fall into one of four categories:  (1) consensual encounters; (2) investigatory detentions, also known as *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), stops; (3) public safety stops; and (4) arrests. *State v. Martinez*, 296 Kan. 482, 485, 293 P.3d 718 (2013). Courts treat traffic stops like *Terry* stops. *State v.*

7

*Jimenez*, 308 Kan. 315, 323, 420 P.3d 464 (2018). During a traffic stop, both the driver and any passengers are seized. *Arizona v. Johnson*, 555 U.S. 323, 333, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009). A traffic stop "is a permissible seizure within the investigatory detention exception established by [*Terry*], so long as the scope and duration of the seizure is strictly tied to and justified by the circumstances that rendered the initiation of the stop proper." *State v. Cleverly*, 305 Kan. 598, Syl. ¶ 2, 385 P.3d 512 (2016).

Jennifer did not challenge the initial traffic stop. Instead, she challenged Officer Brown's choice to request Jennifer's driver's license and then run that license for wants and warrants. The State concedes that Officer Brown seized Jennifer when she stopped Steven's car. Nevertheless, the State argues that when Officer Brown asked Jennifer for her driver's license, Officer Brown was acting within the scope of the traffic stop because she did so "in order to determine if [Jennifer] could lawfully drive the car." As the trial court held, this reasoning is flawed and unconvincing: "Officer Brown knew the car had an invalid registration and was uninsured. The court does not find this explanation plausible. With no explanation as to why defendant was detained the court must conclude the purpose was to check for warrants."

The State argued before the trial court that Officer Brown did not know for sure that the car was uninsured when she asked for Jennifer's driver's license. Officer Brown did testify, however, that because Steven told her the car lacked insurance "at the time [she] asked Ms. Griffith for her identification, the vehicle couldn't be removed from that location except for being towed." Regardless of the insurance issue, the car was still subject to the registration issues pointed out above. Thus, when Officer Brown asked Jennifer for her license, there was no way that Jennifer could have legally driven the car from the scene, as the trial court pointed out.

On appeal, the State attempts to minimize its seizure of Jennifer. It cites the following passage from *Maryland v. Wilson,* 519 U.S. 408, 414-15, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997):

> "In summary, danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car. While there is not the same basis for ordering the passengers out of the car as there is for ordering the driver out, the additional intrusion on the passenger is minimal. We therefore hold that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop."

Then, the State argues that "[i]n this case, Officer Brown did even less than the officer in *Wilson*, Officer Brown merely asked for the defendant's [driver's] license." Officer Brown, however, did not "merely ask" for Jennifer's driver's license—she then ran Jennifer's driver's license to check for outstanding warrants.

In *Wilson*, the United States Supreme Court ruled that a police officer performing a traffic stop may lawfully order passengers out of the car, citing officer safety as its rationale. *Wilson*, 519 U.S. at 413-14. The United States Supreme Court explained:

> "There is probable cause to believe that the driver has committed a minor vehicular offense, but there is no such reason to stop or detain the passengers. But as a practical matter, the passengers are already stopped by virtue of the stop of the vehicle. The only change in their circumstances which will result from ordering them out of the car is that they will be outside of, rather than inside of, the stopped car." *Wilson*, 519 U.S. at 413-14.

The United States Supreme Court went on to conclude that "[w]hile there is not the same basis for ordering the passengers out of the car as there is for ordering the driver out, the additional intrusion on the passenger is minimal." 519 U.S. at 414-15. Here, asking for Jennifer's driver's license and then running it for warrants is more of an

9

intrusion than that faced by a passenger who simply must wait outside of a car rather than inside of it. Instead, Jennifer, who in Officer Brown's own words was not subject to reasonable suspicion or being investigated "for anything," nevertheless had her driver's license seized and run for warrants. Further, our Supreme Court has held that a police officer's request for identification alone is generally not a seizure. See *State v. Pollman*, 286 Kan. 881, 888, 190 P.3d 234 (2008).

Nevertheless, when an officer "retains a driver's license, this can be a factor considered in the totality of the circumstances and may, absent offsetting circumstances, mean a reasonable person would not feel free to leave without his or her license." 286 Kan. at 889. Here, Officer Brown's seizure and retention of Jennifer's driver's license and decision to run it for warrant checks, without informing Jennifer that she intended to run a warrant check, likely meant that Jennifer was not free to leave. Indeed, Jennifer's attorney asked Officer Brown the following question: "At no point in your interaction with Ms. Griffith did you advise her she was free to [walk away or leave]; is that correct?" Officer Brown answered: "That's correct."

The State also argues that "[q]uestions of both the driver and the passengers are permissible as long as they do not extend the length of the stop." The State cites *State v. Morlock*, 289 Kan. 980, 218 P.3d 801 (2009), to support this proposition. The State argues that Officer Brown's request for Jennifer's driver's license, and her choice to run that license for warrants, did not temporally extend the traffic stop because Officer Brown was still waiting to hear from dispatch about any past failures to appear by Steven. This would allow her to determine if she needed to arrest Steven.

Our Supreme Court addressed a similar challenge in *Morlock*; there, Morlock was in the front passenger seat of a rental van and his 16-year-old son drove the van. Police stopped the van. Morlock's odd behavior, including nervousness, strange answers to questions about his travel plans, and staring silently straight ahead at the dash while his

10

teenage son dealt with the police officer, led the police officer to reasonably suspect that Morlock was transporting drugs. As a result, the officer requested Morlock's driver's license and ran a warrant check with the license. Morlock argued, among other things, that the officer "exceeded the stop's constitutionally permissible boundaries" by taking his driver's license and running the warrant check. 289 Kan. at 986. Our Supreme Court disagreed, stating that Morlock's odd behavior gave the officer "reasonable suspicion" that Morlock was involved in criminal activity and, therefore, the license seizure and later warrant check were constitutionally permissible. 289 Kan. at 995-96. On the other hand, here, Officer Brown testified that when she asked for Jennifer's driver's license, she "did not have any reasonable suspicion [Jennifer] was engaged in any criminal activity."

More recently, we are guided in this inquiry by our Supreme Court decision in *Jimenez*. In *Jimenez*, a police officer stopped a car containing a driver and one passenger. The police officer requested both individuals' driver's licenses and the rental agreement for the car. The occupants complied. The police officer asked the driver, Jimenez, to come back to his police car with him; Jimenez complied. In the police car, the police officer used a smartphone application to facilitate questioning Jimenez about her travel plans; neither Jimenez nor her passenger spoke much English. After questioning Jimenez, the police officer called the drivers' licenses into dispatch and requested warrant checks and criminal history reports on both Jimenez and her passenger; the police officer made this call about 5 minutes and 34 seconds after the stop began. Then the police officer used his drug dog to sniff around the car; the dog alerted 6 minutes and 49 seconds into the stop. The police officer and two additional officers searched the car and they found no drugs. Nevertheless, they found about $50,000 in cash. The State charged Jimenez with criminal transportation of drug proceeds or, in the alternative, criminal transfer of drug proceeds.

The driver moved to suppress the cash found during the stop. Among other things, she argued that the police officer "measurably extended the stop by asking travel plan

questions before processing the driver's license and warrant information." 308 Kan. at 319. The trial court agreed and suppressed the evidence. The State filed an interlocutory appeal and the Court of Appeals reversed. 308 Kan. at 320.

Our Supreme Court rejected the State's contention that questions about travel plans never impermissibly extended traffic stops. 308 Kan. at 330. In the absence of direct authority, our Supreme Court drew guidance from the United States Supreme Court's most recent traffic stop case, *Rodriguez v. United States*, 575 U.S. 348, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015), and other post-*Morlock* authority, to reach this conclusion. Our Supreme Court noted the following from *Rodriguez*, 575 U.S. at 354-55.

> "Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate th[at] purpose.' *Ibid.* See also *Caballes,* 543 U.S., at 407. Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed. See *Sharpe,* 470 U.S., at 686 (in determining the reasonable duration of a stop, 'it [is] appropriate to examine whether the police diligently pursued [the] investigation').
>
> "Our decisions in *Caballes* and *Johnson* heed these constraints. In both cases, we concluded that the Fourth Amendment tolerated certain unrelated investigations that did not lengthen the roadside detention. *Johnson,* 555 U.S., at 327-328 (questioning); *Caballes,* 543 U.S., at 406, 408 (dog sniff). In *Caballes,* however, we cautioned that a traffic stop 'can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a warning ticket. 543 U.S., at 407. And we repeated that admonition in *Johnson*: The seizure remains lawful only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.' 555 U.S., at 333. See also *Muehler v. Mena,* 544 U.S. 93, 101[, 125 S. Ct. 1465, 161 L. Ed. 2d 299] (2005) (because unrelated inquiries did not 'exten[d] the time [petitioner] was detained[,] . . . no additional Fourth Amendment justification . . . was required'). An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But contrary to JUSTICE ALITO's suggestion, *post,* at 372, n. 2, he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual. But see *post,* 370 (ALITO, J., dissenting) (premising opinion on

12

the dissent's own finding of 'reasonable suspicion,' although the District Court reached the opposite conclusion, and the Court of Appeals declined to consider the issue)."

Our Supreme Court reasoned that "[t]his means that during a stop an officer may not conduct nonconsensual inquiries unrelated to the mission in a way that prolongs the stop—without the reasonable suspicion ordinarily demanded to justify detaining an individual." *Jimenez*, 308 Kan. at 323-24. Our Supreme Court further noted:

> "*Rodriguez* recognizes this by outlining the permissible scope and duration of police-citizen contact within the traffic stop context. The Court expressly confines the stop's mission to the typical traffic-related inquiries: (1) checking the driver's license; (2) determining whether there are outstanding warrants against the driver; and (3) inspecting the automobile's registration and proof of insurance. 135 S. Ct. at 1615. And it warns, '[o]n-scene investigation into other crimes . . . detours from that mission.' 135 S. Ct. at 1616." 308 Kan. at 325.

Our Supreme Court concluded that the critical issue in determining the legality of nonconsensual inquiries unrelated to the original purpose of the traffic stop is "whether [the inquiry] '"prolongs"—*i.e., adds time to*—"the stop."'" *Jimenez*, 308 Kan. at 325 (citing *Rodriguez*, 135 S. Ct. at 1616). Our Supreme Court applied *Rodriguez* and its progeny to the facts of *Jimenez*, and concluded in that case, the police officer's travel plan questioning "impermissibly extended" the stop. 308 Kan. at 330. Our Supreme Court pointed out the following:

> "[The police officer] admitted his questions concerned 'merely travel plans' that had nothing to do with the traffic violation he observed, and he acknowledged her answers were unnecessary for him to write a ticket. Above all, it is obvious [the police officer] conducted his questioning before he called in the driver's licenses and outstanding warrants checks. Under these undisputed facts, we agree with the district court the questioning was unrelated to the infraction or the traffic stop's mission and measurably extended the stop." 308 Kan. at 330-31.

13

Our Supreme Court also noted that the police officer did not suspect criminal activity when he questioned Jimenez and did "nothing in the interim" while he was questioning Jimenez to process the traffic violation. 308 Kan. at 331.

Neither the trial court's suppression ruling in this case nor the State's appellate brief mentioned *Jimenez*. The trial court's suppression ruling here did not focus on whether Officer Brown's warrant check of Jennifer extended the traffic stop. Nevertheless, the trial court did make several factual findings that are indeed supported by substantial competent evidence.

The trial court found Officer Brown's testimony that she needed to check Jennifer's license to see if Jennifer could drive the car away was not credible because "Officer Brown knew the car had an invalid registration and was uninsured." This is supported by the record, as Officer Brown testified that "at the time [she] asked Ms. Griffith for her identification, the vehicle couldn't be removed from that location except for being towed." Thus, the trial court also concluded that "the purpose [of taking Jennifer's driver's license] was to check for warrants." As a result, the trial court implicitly ruled that the seizure was unlawful because running Jennifer's driver's license for warrants, like the travel questioning in *Jimenez*, was unrelated to the purpose of the traffic stop. Indeed, Officer Brown agreed that "when [she] requested [Jennifer's driver's] license that wasn't connected to [her] investigation with Steven Griffith for driving that vehicle with an expired, or the incorrect decal."

Officer Brown's given reason for requesting Jennifer's driver's license is disingenuous. Officer Brown testified that she stopped Steven for driving the car with an illegal decal. Indeed, this is one of the offenses for which she later arrested Steven. Officer Brown then testified that she wanted Jennifer's driver's license to see if Jennifer could drive the car away. It stands to reason, however, that if Jennifer drove the car away

14

from the scene, she would commit the same offense that Steven was stopped for in the first place: driving a car with an illegal decal. Thus, we conclude that the trial court's factual finding that Officer Brown's given explanation for her warrant check on Jennifer's driver's license was implausible was supported by substantial competent evidence.

At this juncture, we note that the dissenting member of this panel questions our acceptance of the trial court's finding that Officer Brown's given explanation for her warrant check on Jennifer's driver's license was implausible. The dissent focuses on the finding that Officer Brown testified that she asked Jennifer for her license to see if she could "release" the car to Jennifer. According to the dissent, we have "made an inference of bad faith" by finding that reason farfetched since Steven's car lacked insurance and was thus not legally drivable. Slip op. at 38 (Buser, J., dissenting). The dissent argues that Officer Brown may have simply intended to release the car to Jennifer, without the expectation that Jennifer would drive it. That is, the dissent contends that Officer Brown may have been releasing the car to Jennifer to "arrange for private towing . . . ." Slip op. at 38 (Buser, J., dissenting).

But we take issue with this interpretation of the facts because the trial court made a credibility determination that Officer Brown's reasoning was disingenuous. Because we are reviewing the trial court's fact findings for substantial competent evidence, we are barred from reweighing this credibility determination. *Harris*, 284 Kan. at 560, Syl. ¶ 9.

Next, now that we have reviewed the trial court's factual conclusions for substantial competent evidence, we review de novo the legal conclusions drawn from those factual findings. Applying a de novo review and drawing guidance from *Jimenez*, we must determine if substantial competent evidence existed to support the trial court's conclusion that Officer Brown's seizure of Jennifer's driver's license and her later warrant check on Jennifer were inquiries unrelated to the purpose of the traffic stop and, thus, improperly extended the traffic stop.

15

As in *Jimenez*, the warrant check here "impermissibly extended" the traffic stop as Officer Brown ceased processing Steven's traffic infraction to instead pursue her inquiry of Jennifer. The State acknowledges that "[q]uestions of both the driver and the passengers are permissible as long as they do not extend the length of the stop." The State asserts that while Officer Brown was waiting for the results of the warrant check on Jennifer, she "continued to investigate Stephen [*sic*] Griffith's record to see if she was required to arrest him or if she could simply issue a citation." The bodycam footage—the accuracy of which the State does not challenge—does not support this claim. The bodycam footage shows that Officer Brown effectively put her investigation of Steven "on hold" while she ran the warrant check on Jennifer. This is particularly exemplified by Officer Brown's explanation to Steven that she could not answer his question about his driver's license being suspended until dispatch had finished the warrant check on Jennifer. For example, Steven had asked Officer Brown how long his driver's license had been suspended, and Officer Brown responded: "Let me get her returned, see if her [driver's] license isn't suspended, um, and then I'll be able . . . and then I'll have dispatch advise when it was suspended." Further, Officer Brown did not inquire about any failures to appear by Steven until after she had ran the warrant search and arrested Jennifer. Nor did she run the car's illegal decal through dispatch to identify its rightful owner until after arresting Jennifer.

The full transcript of the stop from the time Officer Brown requested Jennifer's driver's license until she arrested Jennifer is as follows:

> Officer Brown to Jennifer: "Do you have your driver's license?
> Officer Brown to Steven: "They didn't tell you your driver's license . . . the parole [office] didn't tell you that?
> Steven: "I've never, never have nothing . . . not a letter, nothing.
> Officer Brown: "Ok.
> Officer Brown: "And you still don't have insurance on this, right?

16

Steven: "No.

Officer Brown: "Yeah, it's not showing any on the computer either.

Officer Brown: "I'm going to reach across you, thank you. [Officer Brown takes Jennifer's license from Jennifer.]

[Officer Brown tells dispatch she'll need to run a warrant check.]

Officer Brown: "Just so you guys don't get freaked out, there is another officer coming, just because of your license being suspended, ok?

Steven: "[inaudible].

[Officer Brown gives Jennifer's license number to dispatch.]

Steven: "Do you know how long that's been the case? . . .

Officer Brown: "What, how long's it's been suspended? . . . Let me get her returned, see if her [driver's] license isn't suspended, um, and then I'll be able . . . I'll have dispatch advise when it was suspended, ok.

Steven: "Yeah . . . the only other time I've been stopped in a vehicle was when I had a jeep, it wasn't wrecked, . . . had no . . . registration, it had never been registered, [inaudible].

Officer Brown: "Well I'll be able to tell you when the accident report was too . . . because that's on there.

. . . .

Officer Brown: "Do you know what happened with your tags? With the decal?

Steven: "No. I haven't gotten this car registered in my name yet, that might be the issue, I'm not sure. I, uh, have some other . . . stuff going on, [inaudible] to lose my job. I just had to testify last week in a case that's going on [inaudible].

Officer Brown to Jennifer: "Ok, so, you've got a warrant."

The delay attributable to the wait for the warrant check on Jennifer was only about 1 minute and 40 seconds. Nevertheless, the relatively short length does not require a conclusion that the seizure was lawful. As our Supreme Court stated in *Jimenez*, "any traffic stop extension without reasonable suspicion or consent—even by a *de minimis* length of time—amounts to an unreasonable seizure when the delay is based on anything but the articulated components of the stop's mission." *Jimenez*, 308 Kan. at 326. Further, as evidenced, Officer Brown was not able to actively further investigate Steven's

17

suspended driver's license because she had otherwise occupied dispatch by asking for a warrant check on Jennifer.

We note that the dissent criticizes the finding that Officer Brown was not able to actively investigate Steven's suspended driver's license while having dispatch run a warrant check on Jennifer. The dissent contends that Officer Brown was multitasking, running a warrant check on Jennifer while answering Steven's questions about his suspended license. Alternatively, the dissent argues that because Officer Brown requested back up, which had not arrived yet, the stop was not extended. See slip op. at 32-35 (Buser, J., dissenting).

But we believe that this argument misses the mark. The purpose of Officer Brown's stop was the illegal decal on Steven's license plate. Upon learning that Steven had a suspended license, investigation of Steven's suspended license also became a valid purpose of Officer Brown's stop. Here, Officer Brown was not able to answer Steven's questions about his suspended driver's license while dispatch processed Jennifer's warrant check. Thus, Officer Brown was not multitasking. Moreover, regardless of whether backup arrived by the time Officer Brown heard back from dispatch on the warrant check, the time dispatch needed to run Jennifer's warrant check necessarily extended the overall duration of the stop.

We also recognize the dissent's contention that police officers may request a passenger's identification as part of a lawful stop for safety purposes. But this contention ignores that Jennifer's complaint hinges on the warrant check impermissibly extending the stop. In the past, this court has recognized this difference, holding that a police officer's ability to run a record check on a passenger did not give the police officer the right to extend the duration of the stop. *In re M.K.W.*, No. 103,414, 2010 WL 4977141, at *3 (Kan. App. 2010) (unpublished opinion).

18

In summary, we conclude that the warrant check on Jennifer necessarily extended the traffic stop. We in turn hold that because the warrant check was unrelated to the purpose of the traffic stop, was not supported by reasonable suspicion of Jennifer, and extended the traffic stop, it was therefore an unlawful seizure.

*Was the Unlawful Seizure Attenuated by the Discovery of Jennifer's Outstanding Warrant?*

Next, the State argues that even if the warrant check was unlawful, "the doctrine of attenuation should allow the evidence to be admissible." The trial court ruled that "[i]f the purpose of the license check is a warrant check the warrant is not an intervening circumstance. No attenuation occurred to prevent application of the exclusionary rule."

When considering attenuation doctrine issues on appeal, this court reviews factual findings for substantial competent evidence. *State v. Sanders*, 310 Kan. 279, 294, 445 P.3d 1144 (2019). When reviewing for substantial competent evidence, this court "does not reweigh evidence, pass upon the credibility of witnesses, or resolve conflicts in the evidence." *State v. Harris*, 284 Kan. 560, Syl. ¶ 9, 162 P.3d 28 (2007). This court exercises de novo review over the ultimate legal conclusion of whether the attenuation doctrine applies. See *State v. Christian*, 310 Kan. 229, 235, 445 P.3d 183 (2019).

The attenuation doctrine allows courts to admit evidence found as the result of an unlawful search or seizure when "the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.' [Citation omitted]." *Utah v. Strieff*, 579 U.S. ___, 136 S. Ct. 2056, 2061, 195 L. Ed. 2d 400 (2016). "No bright-line rule defines when the attenuation doctrine applies. Rather, courts must examine the

19

particular facts of each case and determine whether those circumstances attenuate the taint of illegality." *Sanders*, 310 Kan. at 294.

In *Strieff*, the United States Supreme Court stated that three nonexclusive factors may be considered to determine whether the attenuation doctrine should apply. These factors are as follows:

> "First, we look to the 'temporal proximity' between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search. . . . Second, we consider 'the presence of intervening circumstances.' . . . Third, and 'particularly' significant, we examine 'the purpose and flagrancy of the official misconduct.' [Citations omitted.]" 136 S. Ct. at 2062.

*Temporal proximity*

The United States Supreme Court in *Strieff* "declined to find that this factor favors attenuation unless 'substantial time' elapses between an unlawful act and when the evidence is obtained." *Strieff*, 136 S. Ct. at 2062. In *Strieff*, the police officer found the challenged evidence "only minutes after the illegal stop" and this factor therefore weighed in favor of suppression. 136 S. Ct. at 2062. Neither party here addressed temporal proximity in their briefs, but the undisputed bodycam footage of the stop shows that Officer Brown requested Jennifer's license 4 minutes and 35 seconds into the stop. Jennifer produced her license a little less than 30 seconds later. And Officer Brown told Jennifer she was detained about 1 minute and 45 seconds after Jennifer provided Officer Brown with her license. About 10 minutes later, Officer Brown retrieved Jennifer's purse out of the car. Officer Brown began searching Jennifer's purse in the back of her police car about 25 seconds after retrieving it. Thus, only about 10 minutes had elapsed between when Jennifer was detained and when Officer Brown latched onto Jennifer's purse. This short time period weighs in favor of suppression.

*Intervening circumstances*

The State's argument here relies heavily on Officer Brown's discovery of Jennifer's outstanding warrant. The State wrote: "The Supreme Court was clear that an existing warrant is an intervening circumstance. In this case, the district court erred when it found that the warrant was not an intervening circumstance. The warrant was preexisting, which *Strieff* says attenuates the stop." The State overstates *Strieff*'s holding. *Strieff* does not stand for the proposition that discovery of an outstanding warrant automatically "attenuates the stop"; indeed, *Strieff* reiterated the three, nonexclusive factor test from *Brown v. Illinois,* 422 U.S. 590, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975), discussed earlier. *Strieff* held that discovery of an existing arrest warrant "is an intervening factor that 'strongly favors the State.'" *Sanders*, 310 Kan. at 297 (quoting *Strieff*, 136 S. Ct. at 2062-63). "Strong weight" in favor of the State on one factor does not necessarily mandate a finding of attenuation once balanced with the other two factors:  temporal proximity and police misconduct.

The trial court held that "[w]ith no explanation as to why defendant was detained the court must conclude the purpose was to check for warrants. If the purpose of the license check is a warrant check the warrant is not an intervening circumstance." The trial court's assertion that a warrant is not an intervening circumstance if it is discovered under such circumstances contradicts *Strieff*, and we are required to follow the United States Supreme Court's interpretation of federal constitutional law. See *State v. Lawson*, 296 Kan. 1084, Syl. ¶ 1, 297 P.3d 1164 (2013) ("The United States Supreme Court's interpretation of the United States Constitution is controlling upon and must be followed by state courts."). Recently, in *State v. Tatro*, 310 Kan. 263 445 P.3d 173 (2019), our Kansas Supreme Court dealt with a similar finding by a trial court. There, the trial court "not only gave the arrest warrant little weight, it apparently gave it no weight, finding no intervening circumstance existed." 310 Kan. at 273. Our Supreme Court held that this was error "[g]iven *Strieff*'s holdings." 310 Kan. at 273. Our Supreme Court explained:

21

"Here, the officer discovered an arrest warrant that predated his encounter with Tatro. And Tatro has not argued the warrant was tainted, invalid, or related to the reasons the officer initiated the stop. Upon learning of the warrant, the officer had an independent duty to arrest Tatro entirely unrelated to the reasons for the initial stop. In other words, the arrest was lawful even if the initial seizure was not. And once the officer made a lawful arrest based on the warrant, he had the authority to search Tatro and her purse under the search incident to lawful arrest exception to the warrant requirement. The second factor strongly favors the State. See 136 S. Ct. at 2062-63. Again, however, no single factor controls and all factors must be considered. See *Brown*, 422 U.S. at 600-04." 310 Kan. at 273-74.

Similarly, the trial court here made an error of law by concluding that the warrant was not an intervening circumstance, but the "intervening circumstance" of an outstanding warrant is but one factor among several to be considered.

*Purpose and flagrancy*

Recently, in *Tatro*, our Supreme Court noted that "[t]he third factor—the purpose and flagrancy of the official misconduct—is perhaps the most critical to the analysis." 310 Kan. at 274 (citing *Strieff*, 136 S. Ct. at 2062). Our Supreme Court stated this "significance arises because it focuses on the primary purpose of the exclusionary rule— deterring police misconduct . . . [U]nder *Strieff*, even if an officer conducts a proper search incident to lawful arrest after discovering a warrant, the evidence may still be suppressed if the officer engaged in flagrant police misconduct." 310 Kan. at 274. For a Fourth Amendment violation under the United States Constitution "to be flagrant, more severe police misconduct is required than the mere absence of proper cause for the seizure." *Strieff*, 136 S. Ct. at 2064.

*Strieff* was based on the following facts:

22

"In December 2006, someone called the South Salt Lake City police's drug-tip line to report 'narcotics activity' at a particular residence. App. 15. Narcotics detective Douglas Fackrell investigated the tip. Over the course of about a week, Officer Fackrell conducted intermittent surveillance of the home. He observed visitors who left a few minutes after arriving at the house. These visits were sufficiently frequent to raise his suspicion that the occupants were dealing drugs.

"One of those visitors was respondent Edward Strieff. Officer Fackrell observed Strieff exit the house and walk toward a nearby convenience store. In the store's parking lot, Officer Fackrell detained Strieff, identified himself, and asked Strieff what he was doing at the residence.

"As part of the stop, Officer Fackrell requested Strieff's identification, and Strieff produced his Utah identification card. Officer Fackrell relayed Strieff's information to a police dispatcher, who reported that Strieff had an outstanding arrest warrant for a traffic violation. Officer Fackrell then arrested Strieff pursuant to that warrant. When Officer Fackrell searched Strieff incident to the arrest, he discovered a baggie of methamphetamine and drug paraphernalia." 136 S. Ct. at 2059-60.

On appeal, the United States Supreme Court assumed without deciding that Officer Fackrell lacked reasonable suspicion to stop Strieff because the State conceded the point. 136 S. Ct. at 2062. The United States Supreme Court found that Officer Fackrell did not act purposefully or flagrantly when he searched Strieff but was "at most negligent" because he made "two good-faith mistakes." 136 S. Ct. at 2063. Officer Fackrell's two good-faith mistakes were (1) lacking a sufficient basis to determine Strieff was a short-term visitor who may have been visiting to buy drugs because Officer Fackrell did not know how long Strieff had been at the home and (2) demanding Strieff speak with him, instead of approaching Strieff and simply asking him if he would do so. 136 S. Ct. at 2063. The United States Supreme Court opined that "there is no indication that this unlawful stop was part of any systemic or recurrent police misconduct." 136 S. Ct. at 2063. Further, the Supreme Court held that Detective Fackrell did not act flagrantly because he "sought information from Strieff to find out what was happening inside a

23

house whose occupants were legitimately suspected of dealing drugs. This was not a suspicionless fishing expedition." 136 S. Ct. at 2064.

Recently, in *Tatro*, our Kansas Supreme Court addressed flagrancy and police misconduct at length. Our Supreme Court pointed out:

"[W]hether the third factor weighs in favor of suppression turns on the officer's subjective state of mind. In other words, did the officer act in good faith? Did he honestly but mistakenly believe he had reasonable suspicion to detain Tatro and did so as part of a bona fide investigation of suspected criminal activity, not merely in the hope something would turn up?" 310 Kan. at 274-75.

The trial court in *Tatro* ruled that the officer "'did not testify that he had reasonable suspicion to believe [Tatro] had committed, was committing, or was about to commit a crime when he made contact with her.'" 310 Kan. at 276. The trial court also called the officer's conduct "egregious" and found the factor weighed in favor of suppression. 310 Kan. at 276. Our Supreme Court held that it was "unclear from the record if the officer acted on a good-faith belief he had reasonable suspicion of criminal activity or if his purpose was investigatory in design and purpose and executed '"in the hope that something might turn up."'" 310 Kan. at 277. Our Supreme Court remanded for the trial court to "determine whether the officer honestly but mistakenly believed he had reasonable suspicion of criminal activity, or whether he knew he lacked authority to detain Tatro or did not reasonably believe he had that authority." 310 Kan. at 278.

The trial court here did not explicitly use the words "police misconduct" or "flagrancy" in its ruling, but it did state:

"Officer Brown's stated justification for detaining defendant and checking her license was to determine whether to release the car to defendant. Officer Brown knew the car had an invalid registration and was uninsured. The court does not find this explanation plausible.

24

With no explanation as to why defendant was detained the court must conclude the purpose was to check for warrants. If the purpose of the license check is a warrant check the warrant is not an intervening circumstance. No attenuation occurred to prevent application of the exclusionary rule."

Indeed, Officer Brown explicitly acknowledged the trial court's factual finding about her insincerity in asking Jennifer for her driver's license. During the suppression hearing, Jennifer's attorney asked Officer Brown the following questions:

"Q. [Jennifer's attorney]:  Now, prior to wants and warrants and [Jennifer's] valid I.D., Mr. Griffith had told you there was no insurance on the vehicle?

"A. [Officer Brown]:  Correct.

"Q. [Jennifer's attorney]:  And it would be standard procedure for the Hutchinson Police Department as happened here if a vehicle doesn't have insurance on it, it can't be driven on the road, correct?

"A. [Officer Brown]:  Correct.

"Q. [Jennifer's attorney]:  So at the time you asked Ms. Griffith for her identification, the vehicle couldn't be removed from that location except for being towed; is that correct?

"A. [Officer Brown]:  Correct.

"Q. [Jennifer's attorney]:  And now in this case and the vehicle here was eventually towed?

"A. [Officer Brown]:  Yes, it was."

Thus, unlike in *Tatro*, the trial court here made an implicit finding that Officer Brown was not acting in good faith. Officer Brown testified she did not suspect Jennifer of any criminal activity, and the trial court made a finding of fact, supported by substantial competent evidence, that the reason Officer Brown asked for Jennifer's driver's license was, in fact, to run a warrant check. On the other hand, the United States Supreme Court found no misconduct in *Strieff* because the stop and search there "was not a suspicionless fishing expedition 'in the hope that something would turn up.'" 136 S. Ct. at 2064. Officer Brown's warrant check on Jennifer, however, was apparently such a

25

fishing expedition. Thus, here, the third factor—flagrancy and police misconduct—weighs very heavily in favor of suppression.

*De novo review of the legal conclusion on attenuation*

While we conclude that the trial court erred when it concluded that Jennifer's preexisting warrant was not an intervening circumstance, we are not compelled to remand to the trial court for a new ruling. When the facts are not in dispute, we review legal conclusions under the exclusionary rule de novo. *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018). Here, the facts are not in dispute. We may therefore render our own legal conclusion as to the applicability of the attenuation doctrine here, using the trial court's factual findings that are supported by substantial competent evidence.

As discussed earlier, the brief time between the unlawful search and seizure and the discovery of the evidence weighs in favor of suppression. The preexisting warrant for Jennifer weighs strongly in favor of attenuation. The flagrant "fishing expedition" nature of Officer Brown's search and seizure weighs very strongly in favor of suppression. Indeed, Officer Brown testified that "it's the policy of the law enforcement at the Hutchinson Police Department that pedestrians can be requested for identification and other related information in absence of reasonable suspicion, probable cause." She also testified that "Sometimes, yeah" it would "be routine . . . pursuant to [her] training to routinely run passengers for identification checks," "but if they tell [the police] no, it's a no." Further, she testified that it is the policy of the Hutchinson Police Department to tell these individuals that the police want their licenses "[j]ust to I.D. them." Additionally, the State's reliance on Officer Brown's hollow explanation for the search implicitly concedes that the Hutchinson Police Department policy of running warrant checks on passengers without reasonable suspicion is indeed improper policing. If not, why offer such a weak alternative reason for the search?

26

Moreover, if it is the Hutchinson Police Department's policy to extend traffic stops to run warrant checks of vehicle passengers when the officer has no reasonable suspicion of criminal activity, the enforcement of this policy would be left up to the arbitrary impression of a particular police officer. Again, when Officer Brown was asked if she "routinely [ran] passengers for identification checks," she answered: "Sometimes, yeah." Under this policy, officers would have the unbridled discretion to choose when to enforce this policy and to run a warrant check on passengers of vehicles. Thus, this policy is not based on any objective facts. But instead, the policy is based on the purely subjective impressions of a particular police officer.

The actual text of the Hutchinson Police Department policy is not in the record, and it would have been useful in analyzing this issue. Nevertheless, Officer Brown's testimony indicates the presence of a departmental policy of searching and seizing individuals without reasonable suspicion or probable cause. This is one of the precise kinds of police misconduct that the exclusionary doctrine seeks to address. See *Herring v. United States*, 555 U.S. 135, 144, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009) ("the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence"). We therefore conclude that after weighing the *Brown* factors, the attenuation doctrine does not prevent the application of the exclusionary rule in this case.

Affirmed.

* * *

BUSER, J., dissenting:  I dissent because I believe my colleagues have made two important errors of law in affirming the suppression of evidence in this case. First, the majority has erred in holding that Officer Hannah Brown's obtaining Jennifer Griffith's driver's license and resultant warrant confirmation—which took 1 minute and 40 seconds—measurably extended the investigation and processing of Steven Griffith's traffic violations. Second, assuming for the sake of argument my colleagues are correct, they have erred in concluding that Officer Brown's behavior constituted flagrant official misconduct which vitiated the attenuation doctrine and required suppression of the incriminating evidence.

INTRODUCTION

As a preliminary matter, I believe my colleagues' analysis is misplaced. That is because there is a marked difference between the legal basis for the trial court's ruling and my colleagues' legal conclusion that the evidence should be suppressed. I agree with the majority that "[t]he trial court suppressed the evidence because it concluded that Officer Brown had illegally seized Jennifer when she asked for her driver's license." Slip op. at 6-7. My colleagues, however, did not review the trial court's legal ruling. Instead, they decided this appeal on a wholly different basis:  "[T]he warrant check here 'impermissibly extended' the traffic stop as Officer Brown ceased processing Steven's traffic infraction to instead pursue her inquiry of Jennifer." Slip op. at 16.

Moreover, the majority candidly concedes that "[t]he trial court's suppression ruling here did not focus on whether Officer Brown's warrant check of Jennifer extended the traffic stop." Slip op. at 14. Of course, the difficulty with this lack of focus is that it not only resulted in the trial court not making the legal conclusion analyzed by my

28

colleagues, the trial court also did not make the necessary factual findings to support my colleagues' legal conclusion that Officer Brown impermissibly extended the traffic stop.

In my view, our court should have decided this case based on the trial court's findings of fact and conclusions of law as our standard of review requires. See *State v. Cleverly*, 305 Kan. 598, 604, 385 P.3d 512 (2016) ("When reviewing a motion to suppress evidence, the factual underpinnings of the district court's decision are reviewed for substantial competent evidence and the ultimate legal conclusion is reviewed de novo.").

With regard to the trial court's application of the attenuation doctrine, I agree with my colleagues that "the trial court here made an error of law by concluding that the warrant was not an intervening circumstance." Slip op. at 22. I also agree with the majority that with regard to the third *Strief* factor, "The trial court here did not explicitly use the words 'police misconduct' or 'flagrancy' in its ruling." Slip op. at 24. I do not agree, however, that "the trial court here made an implicit finding that Officer Brown was not acting in good faith." Slip op. at 25. I can find no indication in the trial court's written order that it considered the third *Strief* factor or weighed the three *Strief* factors in concluding that attenuation did not occur. Under the circumstances, *State v. Tatro*, 310 Kan. 263, 277-78, 445 P.3d 173 (2019), would require a remand to the trial court.

With these caveats in mind, I will analyze the majority's holding.

FACTUAL BACKGROUND

I agree with my colleagues regarding certain important facts. First, Officer Brown made a valid stop of the vehicle driven by Steven Griffith. Second, the traffic stop resulted in Officer Brown's seizure of Steven to investigate three traffic violations and process the infractions. Third, because she was a passenger, Jennifer Griffith was also

29

seized while Officer Brown investigated Steven's traffic offenses and processed his infractions. Fourth, during the traffic stop, Officer Brown asked Jennifer one question, "Do you have your driver's license?" Slip op. at 16. Jennifer handed her license to the officer. Shortly after Officer Brown called the dispatcher to check on possible warrants, the officer informed Jennifer, "Ok, so, you've got a warrant." Slip op. at 17. Fifth, the time attributable to obtain the warrant check on Jennifer was only about 1 minute and 40 seconds. Slip op. at 17. Sixth, Officer Brown's conversation with Steven and her actions during this challenged time period were memorialized by the officer's bodycam footage. A transcript of this footage is quoted at slip op. 16-17 of the majority's opinion. Seventh, during this time period, Officer Brown did not have reasonable suspicion to believe that Jennifer was involved in any criminal activity.

With this agreed-upon factual background, I will next apply Fourth Amendment search and seizure law to the facts of this case.

OFFICER BROWN'S REQUEST FOR JENNIFER'S LICENSE AND
WARRANT CHECK DID NOT MEASURABLY EXTEND
THE INVESTIGATION AND PROCESSING OF STEVEN'S TRAFFIC VIOLATIONS

The majority's holding that Officer Brown's request for Jennifer's driver's license and warrant check measurably extended the investigation and processing of Steven's traffic violations is mistaken. A brief survey of Fourth Amendment law pertaining to the rights of passengers in vehicles subject to a valid traffic stop is necessary to the analysis.

"An individual's Fourth Amendment rights are personal, including those of a passenger in an automobile subjected to a traffic stop." *Cleverly*, 305 Kan. 598, Syl. ¶ 7. In the case of a traffic stop, the United States Supreme Court has stated:

> "A lawful roadside stop begins when a vehicle is pulled over for investigation of
> a traffic violation. *The temporary seizure of driver and passengers ordinarily continues,*

30

*and remains reasonable, for the duration of the stop.* Normally, the stop ends when the police have no further need to control the scene, and inform the driver *and passengers* they are free to leave." (Emphases added.) *Arizona v. Johnson*, 555 U.S. 323, 333, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009).

This landmark statement of constitutional law was adopted by our Supreme Court in *State v. Morlock*, 289 Kan. 980, Syl. ¶ 3, 218 P.3d 801 (2009), and reaffirmed recently in *State v. Jimenez*, 308 Kan. 315, Syl. ¶ 1, 420 P.3d 464 (2018).

In particular:

"Beyond simply determining whether to issue a citation, a law enforcement officer's mission in a traffic stop typically includes ordinary inquiries for: (i) checking the driver's license; (ii) determining whether there are outstanding warrants against the driver; and (iii) inspecting the automobile's registration and proof of insurance. The officer may also take negligibly burdensome precautions for officer safety. Information gathering must be limited to the infraction prompting the stop or those matters directly related to traffic code enforcement, i.e., ensuring vehicles on the road are operated safely and responsibly." 308 Kan. 315, Syl. ¶ 3.

Critical to resolving this appellate issue is the well-settled proposition that "[t]raffic stops cannot be measurably extended beyond the time necessary to process the infraction that prompted the stop unless there is a reasonable suspicion of or probable cause to believe there is other criminal activity, or consent." 308 Kan. 315, Syl. ¶ 2.

During the period of time that Officer Brown obtained Jennifer's driver's license and received confirmation of the warrant, Jennifer was seized, the seizure did not morph into a voluntary encounter, Jennifer did not consent to the seizure, and Officer Brown had no reasonable suspicion that Jennifer was engaged in criminal conduct. That leaves the crucial question that is dispositive of this appeal: Did the 1 minute and 40 seconds

31

measurably extend beyond the time necessary to investigate and process Steven's traffic violations? See 308 Kan. 315, Syl. ¶ 2. The answer is, no.

In *Jimenez*, our Supreme Court thoroughly analyzed the important United States Supreme Court opinion, *Rodriguez v. United States*, 575 U.S. 348, 135 S. Ct. 1609, 1615, 191 L. Ed. 2d 492 (2015). Our Supreme Court concluded that

> "officers engaging in traffic stops in *Rodriguez*' wake must be attentive to how and when they conduct what may be viewed as unrelated inquiries. *They must be especially careful to ensure nonconsensual inquiries occur concurrently with the tasks permitted for such stops so they will not measurably extend the time it would otherwise take. We would more simply describe this today as multitasking.*" (Emphasis added.) *Jimenez*, 308 Kan. at 325-26.

Footage from Officer Brown's bodycam memorialized her investigation and processing of the scene during the critical time period which the majority found measurably extended the traffic stop. In my view, this footage proves the opposite—during the 1 minute and 40 seconds that it took to obtain Jennifer's license, call the dispatcher, and receive notification of an active warrant, Officer Brown asked relevant investigatory questions of Steven related to the three traffic violations he was suspected of committing.

In particular, the bodycam footage shows that immediately after asking Jennifer if she had her license, Officer Brown asked Steven if he had received notice about his suspended driver's license, and also inquired if he still did not have liability insurance on the vehicle. Steven acknowledged that he did not have automobile insurance. Officer Brown advised Steven that her computer did not show any insurance on the vehicle. The officer then told Steven she was going to reach across him in order to take Jennifer's driver's license from her.

32

Officer Brown advised the dispatcher that she needed to run a warrant check. Immediately thereafter, she informed both Steven and Jennifer not to get "freaked out" because another officer was coming to the scene to assist her due to Steven's suspended driver's license. The officer then informed the dispatcher of Jennifer's driver's license information.

Steven spontaneously asked Officer Brown how long his driver's license had been suspended. Officer Brown replied that after she checked to see if Jennifer's driver's license was also suspended she would obtain that information for him. Steven then informed the officer about an accident he evidently had while uninsured which resulted in his driver's license suspension. Officer Brown replied that she would be able to tell him the date of the accident based on the accident report. Officer Brown then asked Steven, "Do you know what happened with your tags? With the decal?" Steven responded that he had not registered his vehicle yet because of an employment problem and testimony in a court case. After listening to the dispatcher, Officer Brown then informed Jennifer, "Ok, so you've got a warrant." Jennifer was promptly arrested based on the outstanding warrant.

During this colloquy, Officer Brown asked Jennifer only one question. On the other hand, Steven spontaneously engaged Officer Brown with a question related to the length of time his driver's license had been suspended. As part of her investigation, Officer Brown asked Steven three questions specifically pertinent to his suspended driver's license, improper vehicle registration, and no liability insurance violations.

In summary, the bodycam footage proves that while Officer Brown waited for Jennifer's warrant information, she was actively investigating Steven's traffic violations. It is particularly significant that during this time period the majority claims: "Officer Brown ceased processing Steven's traffic infraction to instead pursue her inquiry of Jennifer," slip op. at 16, when *in fact,* the officer was conversing solely with Steven about

33

background facts to establish the suspended driver's license, improper vehicle registration, and no liability insurance violations. Of particular importance (and irony, given the majority's legal conclusion), Officer Brown's colloquy with Steven during the 1-minute-and-40-second time period resulted in the officer obtaining inculpatory admissions from Steven which could be admitted as evidence in court to prove the improper vehicle registration and no liability insurance violations. See Slip op. at 17.

Support for my position may be found in *State v. Schooler*, 308 Kan. 333, 419 P.3d 1164 (2018). In *Schooler*, our Supreme Court determined "the [deputy's] questioning occurred simultaneously with the deputy's appropriate steps in processing the traffic stop." 308 Kan. at 335. Citing *Jimenez*' embrace of *Rodriguez*' precedent regarding multitasking, our Supreme Court concluded the deputy did not impermissibly extend the duration of the traffic stop. *Schooler*, 308 Kan. at 349-50.

Based on the uncontroverted evidence, Officer Brown was especially careful to insure that the warrant check occurred concurrently with her investigation of Steven's three traffic violations so there would be no measurable extension of the time it would otherwise take to process the traffic stop. See *Jimenez*, 308 Kan. at 325-26. In a word, Officer Brown was lawfully "multitasking." 308 Kan. at 326.

Finally, if my colleagues are correct and this 1-minute-and-40-second time period was wholly unrelated to Officer Brown's investigation of Steven's traffic infractions, there is still no showing that this delay measurably extended the time necessary to process this particular traffic stop. As the bodycam footage shows, Officer Brown told Steven and Jennifer during the challenged time period that she had called another officer for backup assistance. This is a typical, permissible request for a lone officer confronted with a serious traffic stop involving two people. The bodycam footage reveals that the backup officer arrived about 6 minutes *after* Jennifer was arrested, and a third officer

arrived to handle the impoundment and towing of Steven's vehicle about 11 minutes after that.

It is an understatement to observe that to process this complicated traffic stop required the arrival of additional officers and a tow truck. Yet, the delays occasioned by the arrival of additional officers and necessity for a tow truck would have occurred regardless of whether Officer Brown had taken 1 minute and 40 seconds to obtain Jennifer's driver's license and warrant confirmation while conversing with Steven. Stated another way, assuming Officer Brown had not taken the time to inquire into whether Jennifer had any outstanding warrants, the duration of the investigation and processing of Steven's traffic infractions would have been the same. See 308 Kan. 315, Syl. ¶ 2.

In summary, applying *Jimenez* and *Schooler*, the uncontroverted facts show that Officer Brown's request for Jennifer's driver's license and warrant check occurred during the same time the officer was questioning Steven about the facts and circumstances relevant to his three traffic violations. As a result, the 1-minute-and-40-second delay did not measurably extend the investigation and processing of Steven's traffic violations. There was no violation of Jennifer's Fourth Amendment rights and, therefore, no basis to suppress the incriminating evidence discovered in her purse.

OFFICER BROWN'S REQUEST FOR JENNIFER'S LICENSE AND WARRANT CHECK
DID NOT CONSTITUTE FLAGRANT OFFICIAL MISCONDUCT
WHICH VITIATED THE ATTENUATION DOCTRINE

Assuming for the sake of argument that my colleagues are correct that Officer Brown impermissibly extended the traffic stop, I submit they have erred in concluding that Officer Brown's behavior constituted flagrant official misconduct which vitiated the attenuation doctrine and required suppression of the incriminating evidence.

35

As mentioned earlier, I agree with the majority that "the trial court here made an error of law by concluding that the warrant was not an intervening circumstance." Slip op. at 22. Moreover, I agree with my colleagues that the three-factor test expounded in *Utah v. Strieff*, 579 U.S. ___, 136 S. Ct. 2056, 2062, 195 L. Ed. 2d 400 (2016), is the correct test to apply to the facts of this case. Slip op. at 20. In applying this test, I concur with the majority that the short time period between the purported illegal detention and discovery of the incriminating evidence in Jennifer's purse weighs in favor of suppression. Slip op. at 20-21. I also agree with my colleagues that discovery of Jennifer's outstanding arrest warrant, in the words of the United States Supreme Court in *Strieff*, is an intervening factor that "'strongly favors the State.'" Slip op. at 21; 136 S. Ct. at 2062-63.

The gravamen of my disagreement with the majority is its critical finding that the third *Strieff* factor—the purpose and flagrancy of Officer Brown's alleged official misconduct—"weighs very heavily in favor of suppression." Slip op. at 26. My colleagues quote the trial court's order memorializing its determination that Officer Brown provided an implausible explanation to detain Jennifer while checking her driver's license:

> "Officer Brown's stated justification for detaining defendant and checking her license was to determine whether to release the car to defendant. Officer Brown knew the car had an invalid registration and was uninsured. The court does not find this explanation plausible. With no explanation as to why defendant was detained the court must conclude the purpose was to check for warrants. If the purpose of the license check is a warrant check the warrant is not an intervening circumstance. No attenuation occurred to prevent application of the exclusionary rule." Slip op. at 25.

My colleagues state that the trial court "made an implicit finding that Officer Brown was not acting in good faith." Slip op. at 25. They criticize Officer Brown's "hollow explanation for the search." Slip op. at 26. Moreover, they characterize Officer

36

Brown's request for Jennifer's driver's license as a "fishing expedition." Slip op. at 26. Although the written policy of the Hutchinson Police Department is not in the record on appeal, my colleagues also state that Officer Brown's testimony indicated a "departmental policy of searching and seizing individuals without reasonable suspicion or probable cause." Slip op. at 27.

On the contrary, I believe the trial court and my colleagues have misconstrued the evidence presented at the suppression hearing and, as a result, have not properly evaluated the third factor of the *Strieff* attenuation test.

The trial court made nine findings of fact. The fifth finding of fact stated: "Officer Brown testified she asked defendant for her license to determine if the car could be *released* to defendant." (Emphasis added.) I agree there is evidence to support this finding. The trial court, however, found this testimony to be implausible. My colleagues agree because at or about the time Officer Brown asked to see Jennifer's license there was some evidence to believe the vehicle was improperly registered, without liability insurance and, as a result, it could not be lawfully driven away by Jennifer.

Of course, to "release" a vehicle to a third party is not the same as allowing that third party to immediately drive it away without the necessary registration and insurance. In this case, Steven's vehicle was stopped on private property—a Kwik Shop parking lot—not a street or highway. Because it was parked on private property it was not being operated by anyone, hence, while it was parked, there was no violation of the vehicle registration statute. See K.S.A. 2018 Supp. 8-142 (First) (It is unlawful "[t]o operate, or for the owner . . . knowingly to permit the operation, upon a highway of any vehicle . . . which is not registered."). Moreover, given that the vehicle was parked, there was no violation of the automobile insurance requirements. See K.S.A. 2018 Supp. 40-3104 (generally prohibiting the driving or operating of a vehicle without liability insurance).

37

By Officer Brown releasing the vehicle to Jennifer, the passenger would have been able to arrange for private towing of the vehicle, or simply leave the car parked at the Kwik Shop for the time being. In the next day or two, of course, Steven or Jennifer or someone else could have arranged to obtain liability insurance and properly registered the vehicle before driving it from the Kwik Shop parking lot, thus avoiding costly towing charges. In short, the majority has made an inference of bad faith and flagrant police misconduct when Officer Brown's interest in releasing the vehicle to Jennifer was consistent with a practical, cost-effective, and considerate accommodation to Steven and Jennifer.

Officer Brown's intent to facilitate the release of the vehicle to Jennifer is also consonant with our Supreme Court's guidance:

> "If the person responsible for the vehicle desires that the vehicle be left lawfully parked upon the streets or that it be turned over to some other person's custody, then, absent some other lawful reason for impounding the vehicle, his or her wishes must be followed." *State v. Fortune*, 236 Kan. 248, 257, 689 P.2d 1196 (1984).

Another valid reason for Officer Brown to obtain Jennifer's driver's license and check for warrants was for officer safety. See *United States v. Rice*, 483 F.3d 1079, 1084 (10th Cir. 2007) ("While a traffic stop is ongoing . . . an officer has wide discretion to take reasonable precautions to protect his safety. Obvious precautions include running a background check on the driver and removing the occupants from the vehicle. Furthermore, because passengers present a risk to officer safety equal to the risk presented by the driver, an officer may ask for identification from passengers and run background checks on them as well. [Citations omitted.]").

During the suppression hearing the following colloquy occurred between Officer Brown and defense counsel:

38

"Q. When you asked [Jennifer] for her identification you weren't concerned for your safety, correct?

"A. That's always a concern.

"Q. So [Jennifer] made threatening gestures toward you?

"A. No, but officer safety is always . . . my concern."

Indeed, Officer Brown was a solitary officer attempting to investigate a traffic stop involving two persons without knowing the identity or warrant status of the passenger. Our Supreme Court has stated that during a traffic stop, "The officer may also take negligibly burdensome precautions for officer safety." *Jiminez*, 308 Kan. 315, Syl. ¶ 3. As the colloquy indicates, Officer Brown did have safety concerns when she requested identification from Jennifer. The officer's simple request and Jennifer's prompt response was surely a negligibly burdensome precaution given Officer Brown's concern for officer safety.

Finally, my colleagues presume, without providing legal precedent, that Officer Brown's request for identification and warrant check was "'flagran[t] official misconduct.'" See slip op. at 20, 25-26. But there is relevant federal precedent for the proposition that an officer may lawfully request identification and conduct brief background checks of passengers during a valid traffic stop. See *United States v. Kitchell*, 653 F.3d 1206, 1218 (10th Cir. 2011) (Noting the officer's act of requesting and waiting for a warrant check to be performed on all three occupants of a vehicle was a reasonable task during the 22-minute traffic stop.); *United States v. Fernandez*, 600 F.3d 56, 62-63 (1st Cir. 2010) (concluding that the officer conducting a traffic stop did not need independent justification to ask the passenger for identification); *United States v. Soriano-Jarquin*, 492 F.3d 495, 500 (4th Cir. 2007) ("If an officer may 'as a matter of course' and in the interest of personal safety order a passenger physically to exit the vehicle, he may surely take the minimally intrusive step of requesting passenger identification. [Citation omitted.]"); *United States v. Jenson*, 462 F.3d 399, 403-04 (5th

39

Cir. 2006) (An officer may ask for a driver's license and registration of the occupants and may run a computer check on both.).

I am not persuaded that under the circumstances of this case, Officer Brown's simple request for Jennifer's driver's license information and obtaining a warrant check was flagrant official misconduct. Indeed, the United States Supreme Court has stated: "[T]o be flagrant, more severe police misconduct is required than the mere absence of proper cause for the seizure." *Strieff*, 136 S. Ct. at 2064. I would conclude that Officer Brown's conduct was lawful and appropriate under the unique circumstances of this case. However, if there was an infirmity in Officer Brown's processing of the traffic stop, weighing the three factors of the *Strieff* test, I would conclude that the officer's conduct was attenuated by the discovery of the outstanding warrant, and for this reason, it was error to suppress the incriminating evidence.